UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

KENYATTI JORDAN,                    )
        Petitioner          )
                    )
                    )
v.                                 )
                    )
THOMAS REILLY,                     )
        Respondent.         )
                    )

Civil Action No.

# 04 - 10925 NG

MAGISTRATE JUDGE _Alexander_

RECEIPT # _55789_
_85_—
SUMMONS ISSUED _____
LOCAL RULE 4.1_____
WAIVER FORM_____
MCF ISSUED_____
BY DPTY. CLK._____
DATE_____5-10-04_____

**PETITIONER'S INITIAL MEMORANDUM IN SUPPORT OF
HIS PETITION FOR WRIT OF HABEAS CORPUS**

In initial support of his petition, Kenyatti Jordan says as follows:

## I. Procedural And Factual Background.

On April 28, 1997 a grand jury sitting in Suffolk County returned two indictments against

the petitioner Kenyatti Jordan. The indictments alleged the first degree murder of Joseph Dozier

on February 21, 1994, and unlawful possession of a firearm. The case against the petitioner

consisted mainly of his own statements to the Boston police at a time when he was a cooperating

federal witness.

The petitioner duly filed a motion to suppress his statements, and an evidentiary hearing

was held before the Honorable Judge Mulligan on January 12-15, 1998. Judge Mulligan filed a

Memorandum of Decision denying the petitioner's motion to suppress on June 9, 1998.

On January 21, 1999 the petitioner's trial began before a jury and the Honorable Judge

Volterra. On February 2, 1999 the case was submitted to the jury; the jury returned its guilty

verdicts of first degree murder (based on premeditation and extreme atrocity or cruelty) and

unlawful possession of a firearm on February 8, 1999. On February 23, 1999 the petitioner was

sentenced to natural life and a concurrent sentence of four to five years on the firearm charge. He

then exhausted his state remedies and on March 26, 2003 the Supreme Judicial Court affirmed

his convictions.  See *Commonwealth v. Kenyatti Jordan*, 439 Mass. 47 (2003). This habeas

corpus petition has followed. The petitioner is serving his Massachusetts sentence in an out of

state facility.

### A. The Motion To Suppress

The central issue to be resolved by the motion to suppress was the impact of a meeting

between an Assistant United States Attorney (George Vien), two agents working with him (Steve

Mitchell and Domenic Colameta), their informant (the petitioner), and two Boston police

homicide investigators (Herbert Spellman and Paul Joyce).

### 1. The Evidence

Sgt. Detective Herbert Spellman testified that he was assigned to the Boston police

homicide unit. H.Tr.1:22. On January 9, 1997 he went with Sgt. Detective Paul Joyce to AUSA

George Vien's office for an interview that had been arranged in a conversation with Steve

Mitchell. H.Tr.1:29-30. When he and Joyce entered, AUSA Vien, the petitioner, Mitchell and

Domenic Colameta were present. H.Tr.1:30. He thought Colameta was a BHA or HUD officer.

H.Tr.1:30. Greetings were exchanged. H.Tr.1:30. AUSA Vien was at his computer. H.Tr.1:31.

Vien asked him the name of the victim, and he told him Joseph Dozier. H.Tr.1:31. Vien printed

out a document; he read it and passed it back to Vien. H.Tr.1:31. Joyce did not review the

document. H.Tr.1:63-64. The document said that the United States was going to offer a proffer to

the petitioner that they wouldn't prosecute him.[1]

H.Tr.1:31.

In actuality the letter said nothing of the kind; the letter offered use immunity (except for impeachment or a prosecution based on false statements) and specifically denied derivative use immunity citing *Kastigar*.

Vien signed it and the petitioner signed it. H.Tr.1:31. Then they went to a conference room down the hall. H.Tr.1:32. When they got there he told Vien that just he and Joyce would do the petitioner's interview. H.Tr.1:32. He told Vien that he would be mirandizing the petitioner because everything the petitioner said was going to be taken back to the Suffolk County District Attorney's Office. H.Tr.1; 32-33. Vien talked to Mitchell about leaving the room. H.Tr.1:32. Spellman said that if the petitioner didn't feel comfortable he could go outside and talk to Mitchell anytime he wanted to. H.Tr.1:33. Mitchell and Colameta left the room. H.Tr.1:33.

He told the petitioner that unlike the United States Attorney's Office they couldn't offer any promises, rewards, or inducements and that anything he told them they would have to bring back to their boss. H.Tr.1:34. He mirandized him, and then the petitioner left the room to speak to Mitchell. H.Tr.1:34. He was out of the room about two minutes; Mitchell then came to the door and the petitioner sat back down. H.Tr.1:36. Spellman asked are we going to go through with this, and the petitioner said yes. H.Tr.1:36. The petitioner refused to be tape recorded. H.Tr.1:37. The petitioner placed himself at the scene of the shooting in front of Boston Latin Academy and admitted that he had a .40 caliber weapon on his person; however, he said Antonio Jones did all the shooting and that he was back at the wall when the shooting occurred. See

---

1 The proffer letter was marked as Exhibit 14 at the motion hearing and Exhibit 49 at trial. See H.Tr.3:22; Tr. 6:39.

H.Tr.1:39-41.

Spellman testified that he interviewed the petitioner a second time on May 5, 1997. H.Tr.1:42. He informed the petitioner that he had been indicted for the Dozier murder and asked him if they could clear up a part of his statement that he had not been truthful about. H.Tr.1:43. The petitioner signed a Miranda form. H.Tr.1:45. Detective McCarthy told the petitioner that a civilian witness put two shooters at the scene; the petitioner changed his January 9th statement by putting himself next to Jones at the top of the platform in front of the school. H.Tr.1:48.

Detective Dennis Harris testified that he first interviewed the petitioner in March of 1994 at which time the petitioner denied having anything to do with the Dozier shooting. H.Tr.2:7, 21. He next interviewed the petitioner with Detective McCarthy on April 16, 1997 at the Bristol County House of Correction. H.Tr.2:23. The petitioner signed Miranda forms. See H.Tr.2:24-29. They conducted a pre-tape interview and a taped interview. H.Tr.2:30.

According to Harris, McCarthy asked the petitioner about the January 9th meeting before the tape was turned on. See H.Tr.2:44-45. The petitioner said he recalled speaking with the two agents before he spoke with Spellman and Joyce, and they asked if he was okay doing what he was doing. Tr.2:44. According to Harris, McCarthy told the petitioner that he wanted to know if the petitioner was clear that the letter of immunity applied to federal court only and not to what was going on in state court; the petitioner said he understood that the letter of immunity applied to the federal authorities and that he had spoken to Spellman and Joyce on a state matter.[2] H.Tr.2:45.

_____

2 McCarthy did not testify at the motion hearing. At trial Harris gave an interesting little spin to this testimony. Harris said the petitioner was clear about what Spellman and Joyce had explained to him relative to the letter of immunity; he was  clear that the letter of  immunity pertained to the federal authorities in federal court, and not to what was going on in state court. Tr.4:170.

Sgt. Detective Paul Joyce testified that after introductions were made in Vien's office, he was on the right side of the room with Colameta and Mitchell while Spellman was on the left side with Vien. H.Tr.2:67, 75. He wasn't part of their conversation. H.Tr.2:76. He recalled that Vien asked for the name of the victim and the date of the incident. H.Tr.2:76. He observed that Spellman was given a document and that Spellman glanced at it and gave it back to Vien. H.Tr.2:76. Joyce said that he wasn't given the document. H.Tr.2:77. They were in Vien's office only five minutes. H.Tr.2:77. Vien seemed rushed; he had to get to Court or somewhere. H.Tr.2:77.

The six of them went down the hallway to a conference room. H.Tr.2:78. Vien asked if Mitchell could sit in and Spellman said the policy at Homicide was that two detectives conduct the interview. H.Tr.2:78-79. Vien said that the petitioner would be comfortable with Mitchell in the room; Spellman replied that if the petitioner became uncomfortable he could speak to Mitchell. H.Tr.2:79. Spellman and Vien remained in the hallway. H.Tr.2:79.

In the conference room Spellman told the petitioner that he was a suspect. H.Tr.2: 80. The petitioner declined to have the interview taped. H.Tr.2:80. Spellman mirandized him and asked if he would testify to the grand jury. H.Tr.2:81. The petitioner said he would. H.Tr.2:81. They told him that they were investigating a state homicide, and that anything he said could be used against him. H.Tr.2:82. They told him they couldn't offer immunity, promises, inducements or rewards, and that they were there just to get the truth. H.Tr.2:82.

The petitioner became visibly nervous and said he wanted to speak to Mitchell. H.Tr.2:82. He left the room and several minutes later came back. H.Tr.2:82. They asked if everything was okay and if he still was willing to speak with them; he replied yes. H.Tr.2:82.

AUSA George Vien testified that he was assigned to the Drug Unit. H.Tr.3:14. The

meeting was arranged by Mitchell; the purpose of the meeting was so that the Boston police

could interview the petitioner about a homicide. H.Tr.3:16-17. According to Mitchell, the

petitioner was hesitant to talk; Vien told Mitchell to bring the Boston police to his office where

he would provide a proffer letter to the petitioner so they could interview him. H.Tr.3:17. A

proffer letter says in substance that the government won't use what they say directly against

them. H.Tr.3:18. It's not an immunity letter. H.Tr.3:18.

Vien discussed the ground rules and explained the letter to the petitioner and then

everyone in the room. H.Tr.3:19. The petitioner signed the letter. H.Tr.3:19. He handed the letter

to Spellman.H.Tr.3:21-22.

Joyce and Spellman said they wanted to interview the petitioner by themselves, so he told

Mitchell and Colameta to stand outside the conference room. H.Tr.3:23. He said his best memory

was that he discussed the ground rules in the conference room. H.Tr.3:27.

Vien testified that he thought they were all doing this work together, that the interview

was taking place under the United States Attorney's auspices, and that the proffer letter

controlled. H.Tr.3:36. As he understood it the petitioner wasn't going to talk to them without

some kind of protection. H.Tr.3:50. He told the petitioner that nothing he said could be used

against him directly. H.Tr.3:77.

Steve Mitchell testified that he was a Special Agent with the Inspector General's Office

for HUD, and had been a BHA officer. H.Tr.3:83. The petitioner was one of his confidential

informants. H.Tr.3:84.

The petitioner wanted protection to cooperate and he told the petitioner that the first stage

was a proffer letter. H.Tr.3:88. He spoke to Joyce and Joyce told him to bring the petitioner to

the D Street station. H.Tr.3:89. He told Joyce that they couldn't do a proffer at D, that it was

done at the United States Attorney's Office. H.Tr.3:89.

At the meeting, Vien printed out the letter and asked him to make copies. H.Tr.3:90-91. He did and handed one to everyone. H.Tr.3:91 Vien explained the ground rules to all of them. H.Tr.3:92. Vien said the ground rules a second time in the conference room. H.Tr.3:92-93.

Mitchell told the petitioner that anything he was about to say to Spellman and Joyce could not be used against him by them. H.Tr.3:93. At one point the petitioner came out of the conference room, and said that he asked the police about immunity. H.Tr.3:94. Mitchell then went in the conference room, and the detectives said they couldn't give the petitioner immunity, only the District Attorney could. H.Tr.3:94. One of them said you can trust me; Mitchell figured they had already talked to the District Attorney. H.Tr.3:94. He went out and told the petitioner to go in there and tell the truth and not lie. H.Tr.3:94-95.

Domenic Colameta testified that he was a Special Agent with the Inspector General's Office for HUD. H.Tr.3:131. He knew the petitioner wanted protection for the interview he was about to give. H.Tr.3:133. The proffer letter was photocopied and distributed. H.Tr.3:134-135. Vien said the letter set the ground rules. H.Tr.3:135. Anything the petitioner said couldn't be used against him provided he told the truth. H.Tr.3:135. In the conference room Vien reminded all the parties of what they had previously discussed. H.Tr.3:136.

The petitioner came out of the room and said to Colameta that they won't offer me immunity. H.Tr.3:137. He signaled Mitchell who was down the hall. H.Tr.3:137. The petitioner said the same thing to Mitchell. H.Tr.3:137. Mitchell went into the room. H.Tr.3:137. Mitchell came back out and said to the petitioner go in there and tell the truth. H.Tr.3:137.

## 2. The Findings

For the most part the motion judge credited the testimony of the "federal" witnesses where that testimony was in direct conflict with that of the Boston police homicide investigators. Copies of the proffer letter were passed to those in the room. Memorandum Of Decision On Petitioner's Motion To Suppress, p.5. Vien stated that if Jordan told the truth, anything he said could not be used against him directly, but that the police could follow up on the information. Memorandum Of Decision, p.5.

In his findings of fact the motion judge made certain critical legal conclusions. First, the motion judge found that "Spellman knew that he had no authority to enter into such an agreement" and "felt that the proffer letter had no application to proceedings in state court". Memorandum Of Decision, p.5. Second, the motion judge found that "[w]hatever impression Jordan may have held about the effect of the proffer letter" he knew after the homicide detectives told him that only the District Attorney grants immunity that the proffer letter "did not provide protection from the use of anything he might say against him in state court". Memorandum Of Decision, p.6.

### B. The Trial

#### 1. Jury Selection

When the jury box was first filled with sixteen jurors there were nine men and seven women. See Tr.1:20-46 (Brian Joynt, Iilessia Davis, Caroline Powers, William Rice, Peter Fiore, Calvin Castor, Charles Hurl, Judith Gill, Christine Gatewood, Matthew Camp, Cheryl Nin, Roseann Lombardi, Kevin Westerberg, Peter Meulenbroek, Eric Hanson, and Christina Chun). The Commonwealth challenged four jurors, two men and two women. See Tr.1:47, 50-52 (Christine Gatewood replaced by Blanca Toro; Roseann Lombardi replaced by Diane Kelly; Peter Meulenbroek replaced by Sandra Yuil; Eric Hanson replaced by Margaret Regan). After

the box was refilled there were seven men and nine women. The Commonwealth reported that it was content. Tr.1:52.

The petitioner then announced nine challenges, five men and four women. See Tr.1:52-53. (Brian Joynt, William Rice, Peter Fiore, Charles Hurl, Judith Gill, Kevin Westerberg, Sandra Yuil, Margaret Regan, and Christina Chun). The prosecutors complained that "all of the white males currently sitting" were challenged and that "there is a pattern here of trying to knock off based on race". Tr.1:54. The defense responded that two white men and three white women remained on the panel (which would have been a panel of seven). Tr.1:55. The prosecution rejoined that the petitioner was improperly counting as white a Hispanic male and female who were not white "under our case law". Tr.1:55.

The trial court announced that there was a pattern of excluding "white males", see Tr.1:56, and found a pattern of "gender and racial strikes", see Tr.1:58. The defense was required to explain the proposed challenges. Tr.1:58. The defense responded that Brian Joynt was challenged because he had a job he wanted to go to. William Rice was challenged because he worked for W.R. Grace and would not be sympathetic, given the book and movie, *Civil Action*, with the individual versus the state. Tr.1:58-59. Peter Fiore was challenged because he looked unsympathetic to the petitioner. Tr.1:59. Charles Hurl, Judith Gill, and Margaret Regan were challenged because of their connections to the police. Tr.1:59-60. Christina Chun was challenged because she appeared pro prosecution. Tr.1:60-61. Sandra Yuil was challenged because she had a master's degree and highly educated jurors could be very removed from street violence. Tr.1:61. Kevin Westerberg was challenged for the same reasons. Tr.1:61. The trial court overruled the challenges to William Rice, Peter Fiore, and Kevin Westerberg. Tr.1:62. The next day Westerberg was excused for a work related issue. See Tr.2:3. Rice and Fiore deliberated the

9

petitioner's case.

### 2. The Trial Evidence

The Commonwealth had no case without the petitioner's statements.

On February 21, 1994 Sgt. Daniel Linsky responding to a radio transmission observed a body face down almost in the middle of the cross walk in front of Boston Latin Academy. Tr.3:41-43. The paramedics arrived at about 7:00 p.m., and there were no signs of life. Tr. 3:142,144. Medical examiner Stanton Kessler performed the autopsy of Joseph Dozier. Tr.5:9. There were wounds to the face, left leg and chest; the cause of death was multiple gun shot wounds. Tr. 5:9,31. Eight bullets were recovered in the body and two in the left pant leg. Tr.5:14. There were a total of eighteen gunshot wounds. Tr.5:13.

Denise Strother was, at the time, living at 220 Townsend St. Tr.3:92. She was in her living room in the early evening and heard about twelve shots; she went upstairs and saw a body lying in street. Tr.3:93. She called the police. Tr.3:94. There were four 911 calls and the first call was at 6:47 p.m. Tr.3:149.

Karen Valentini testified that at the time in question she lived directly across the street from Latin Academy. Tr.3:95. She was in her living room and heard loud noises like arguing. Tr.3:96-97. She looked out her sliding doors to the school and saw three people across the street. Tr.3:97-98. One was on the sidewalk, and two were on the stairs with their backs toward the school Tr.3:98. They were arguing. Tr.3:99. One was taller and the other a little shorter with white pants on.[3] Tr.3:101. The one wearing the white pants pulled out a gun. Tr.3:101.

The person on the sidewalk said no man no and put up his hands; the person with the gun started to shoot like eighteen shots. Tr.3:102. The victim turned to run, and he just fell. Tr.3:103.

---

3 Antonio Jones was six foot two, and the petitioner about five foot eleven. Tr.5: 92.

She ran upstairs to get a better view, and saw the taller one pull out a gun and start shooting. Tr.3:104. Five or six more shots were fired. Tr.3:105. The two men turned and walked kind of quickly towards Humboldt on the pathway behind the school. Tr.3:105-07. After they left she went to the victim. Tr.3:107. On cross-examination she denied telling the grand jury that when she went upstairs she saw both persons shooting. Tr.3:121.

The police recovered from the crime scene twenty-one spent casings and three spent bullets. Tr.3:55. There were two different types of semi-automatic ammunition, twelve .32s and nine .25s. Tr.4:57. Two .32 spent bullets and one .25 spent bullet were also recovered. Tr.4:57-58. Six of the .32 caliber casings were found in middle of crime scene, and another six coming up the stairs to the platform. Tr.4: 78. Three .25 caliber casings were found in the crosswalk, and an additional six up the stairs. Tr.4:78.

The .32 casings came from the same weapon. Tr.4:72. The .25 casings came from the same weapon. Tr.4:71. The ballistician, Catherine Doherty, also opined that the types of guns used were a .25 semi-automatic Beretta and a .32 semi-automatic Davis Industries. Tr.4:68-69.

Boston police homicide detectives executed a search warrant at 43 Hollworthy Street on March 21, 1994 in connection with the investigation of another homicide for which Antonio Jones was a suspect. Tr.4:13,36. Inside a mattress they found a .32 caliber revolver and assorted ammunition, including .32 caliber automatic cartridges. Tr.4:19,24. They also found a white pair of dungaree pants. Tr.4:26. In addition, they discovered a series of photographs depicting Jones and the petitioner with weapons in their hands. See Tr.4:27-31. The same bunting tool was used for the .32 caliber shell casings recovered from the scene and the .32 cartridges seized at Hollworthy Street. Tr.4:107. Three bullets recovered from the victim came from the same melt of lead as did a comparison bullet seized at Hollworthy Street. Tr.5:53,56.

The petitioner's statements to the police were introduced through the testimony of Herbert Spellman and Dennis Harris, and the two on tape were played to the jury.

Sgt. Detective Spellman testified that he responded to the scene of the shooting around 7:00 p.m. on February 21, 1994. Tr.5:90. He observed the body covered with a white sheet. Tr.5:91.

He first met the petitioner on December 10, 1996 at his D Street office. Tr.5:92. Sgt. Stephen Meade called and said he was with the petitioner and asked Spellman if he wanted to talk to the petitioner; Spellman said he did and the petitioner showed up with two state police officers. Tr.5:92-93. The petitioner said that at the time in question he was at an apartment on Hollworthy Street with Jones and a couple of girls. Tr.5:94. The petitioner said that if Jones was arrested, he would be his alibi. Tr.5:94.

On January 9, 1997 he went to AUSA George Vien's office to interview the petitioner. Tr.5:95. The petitioner was in the office with Vien, HUD investigator Dominic Colameta, and BHA police officer Steve Mitchell. Tr.5:95-96. Introductions were made, and then AUSA Vien asked the name of the victim and the date of the incident. Tr.5:96. Moments after Spellman answered Vien gave him a piece of paper that said something about the United States granting the petitioner immunity from prosecution if he told the truth in all matters. Tr.5:97. Spellman only saw the paper for a matter of moments; the parties to the letter were AUSA Vien and United States Attorney Donald Sterns. Tr.5:97. Vien signed it and gave it to the petitioner to sign. Tr.5:97.

The group then went to a conference room; prior to going in, Spellman told Vien that just Joyce and he would conduct the interview. Tr.5:98.

He advised the petitioner of his rights and told him he was a suspect. Tr.5:99. He told the

petitioner that unlike the federal government, he represented the Suffolk District Attorney's

office. Tr.5: 101. He told the petitioner that anything he told them could be used against him, and

that they couldn't offer any promises, rewards, or inducements. Tr.5:101. The petitioner asked if

he could go to talk to Mitchell; and, was out with Mitchell two to four minutes. Tr.5:102. When

the petitioner came back he asked the petitioner if they could still do the interview. Tr.5:102. The

petitioner said sure, but didn't want the interview taped. Tr.5:102-03.

The petitioner said he got paged by Jones sometime in the afternoon, and went to his

house on Hollworthy Street. Tr.5:107. They went to Adams Street and met two girls; left them

and came back to Hollworthy. Tr.5:104. They made arrangements to meet two girls around 7:00

in front of the Trotter school. Tr.5:104. Jones then got a call, and when he hung up he explained

the call to the petitioner. Tr.5:104.

He had given Dozier a gun and Dozier got arrested with it or lost it. Tr.5:105. Jones then

went to a closet and got a .25 and a .32. Tr.5:105. Jones asked him to go with him while he took

care of business with Dozier. Tr.5:105. The petitioner told Jones that it wasn't his beef but he

would go along to look out for him. Tr.5:105. On the way over Jones told him it was time for

payback for the lost gun and that he was going to set it off. Tr.5:106.

The petitioner stayed back by the wall as Jones went to the platform in front of the

school. Tr.5:107. Jones and Dozier met up in front of the stairs. Tr.5:108. Jones fired and hit

Dozier right in the chest. Tr.5:108. Dozier turned and ran down the stairs, and Jones continued

after him. Tr.5:108. After the shooting they jogged back to Jones's house. Tr.5:108. Jones

changed his clothes. Tr.5:109. Then they went out to meet two girls. Tr.5:109. They met the girls

and went back to the apartment. Tr.5:109. After the girls went home, he took a bus back to the

South End.[4] Tr.5:109.

Spellman testified that he next saw the petitioner on May 5, 1997 at the Bristol County Jail. Tr.5:110. He was with Detective McCarthy. Tr.5:111. The petitioner signed a Miranda form. Tr.5:114. He told the petitioner that they had new information that there were two shooters involved. Tr.5:117. The petitioner said he was up near Jones but wasn't the shooter. Tr.5:117. Spellman said he conducted a pre-interview and then a taped interview. Tr.5:117. The taped interview was played for the jury. See Tr.5:120.

Detective Dennis Harris testified that he first met the petitioner on March 21, 1994 when he interviewed him with detective James Doyle and detective John McCarthy. Tr.4:140. The petitioner was advised of his rights and signed the form. Tr.4:141,144. The petitioner said he recalled when Dozier was killed. Tr.4:148. He was residing at the Ambrose House, and was afforded certain privileges. Tr.4:148. He recalled signing out that day about 3:00 p.m. to his mother's house, but actually went to his friend Antonio Jones's at 43 Hollworthy Street in Roxbury. Tr.4:149. They took a cab to a second location, and a cab back to Hollworthy at about 5:30 p.m. Tr.4:149-50. About 6:00 they left again on foot for Trotter Park to meet two young ladies; then they walked back to the apartment. Tr.4:150. They stayed together until about 9:00 p.m. when all four of them walked to the bus stop. Tr.4:151. The girls' bus came first, and then the petitioner went back to Ambrose House. Tr.4:151.

Harris met the petitioner again on April 16, 1997 at the Bristol County Sheriff's office with detective John McCarthy. Tr.4:153. He advised the petitioner of his rights; the petitioner

---

4 Steven Robinson, a social worker at the Ambrose House, a residential program, testified that the petitioner was a resident there and on the date in question was signed out and called the program from 43 Hollworthy Street at 6:40 p.m. See Tr.3:150-58. The petitioner was back at the program at 9:43. Tr.3:159.

agreed to speak and provided a statement, which was eventually tape recorded. Tr.4:157.

The petitioner said that while he was at Jones's apartment, Jones received a phone call. Tr.4:158. Jones later told him that the call was from Dozier. Tr.4:158. He heard Jones say during the phone call, I'll bring that. Tr.4:158. After hanging up, Jones said to the petitioner that Dozier thinks I'm stupid, he wants another burner, I'll bring him more than a burner this time. Tr.4:158. Jones told the petitioner that he had been beat for a gun in the past. Tr.4:159. Dozier had told Jones he got arrested with a gun; but, Dozier's girlfriend told Jones Dozier was lying, that he never got arrested. Tr.4:159. Jones told the petitioner he had agreed to meet Dozier in front of Latin Academy. Tr.4:160.

They both armed themselves. Tr.4:160. The petitioner took a .40 caliber automatic, and Jones took two handguns, a .25 and a .32 or .380. Tr.4:160. The petitioner said he took up a position on the wall in front of Latin Academy, and Jones went to the platform. Tr.4:160. The petitioner saw Dozier approach. Tr.4:161. Jones and Dozier had a face to face and then shots were fired. Tr.4:161. Dozier was running down the stairs and Jones was chasing and firing. Tr.4:161. Dozier fell on the street in front of the school. Tr.4: 161. Jones stood over Dozier firing. Tr4:161.

After the shooting, he fled to the right of the building and met up with Jones, and they went directly back to Hollworthy Street. Tr.4:162. That night he received a call from Jones; they decided that they would just provide a story. Tr.4:163. A short time later he gave the .40 back to Jones. Tr.4:163.

Detective McCarthy asked the petitioner if he remembered the Spellman and Joyce interview. Tr.4:169. The petitioner was asked what conversation he had with the agents in the hallway. Tr.4:169. The petitioner said the agents asked him if he was okay doing what he was

doing, and he told them yes. Tr.4:170. The petitioner stated he was clear when Spellman and Joyce explained to him that the letter of immunity pertained to the federal authorities in federal court not to what was going on in state court. Tr.4:170.

Harris asked the petitioner why in the first interview in March of 1994, he wasn't truthful. Tr.4:170. The petitioner said he was young and thought it was just a game. Tr.4:170. Harris asked why the petitioner decided to cooperate with Spellman and Joyce. Tr.4:170. The petitioner said he was sick and tired of everyone coming to question him on a homicide; he didn't want to go to jail for the rest of his life for something he didn't do. Tr.4:170. He said he was there but didn't shoot. Tr.4:170-171. The petitioner then agreed to make a taped statement. Tr.4:171. The tape was played for the jury. See Tr.5:60.

Kier Beveridge, a twenty-two year old, testified, with some prompting, that five years earlier at the Ambrose House he observed the petitioner change the channel and watch the news. Tr.3:163. The petitioner said me and my boys did this.[5] Tr.3:170.

The defense case included the petitioner's testimony that he was at the scene but didn't shoot anyone, the witnesses to the proffer letter, and evidence concerning Karen Valentini's vantage points.

AUSA George Vien testified that the petitioner was a cooperating witness on two cases that he was involved with. Tr.6:15. Mitchell told him that the Boston police wanted to talk to the petitioner about a murder and that the petitioner was hesitant to do it without any kind of protection. Tr.6:16. He said to Mitchell to bring the petitioner in and that they'd give him a proffer letter so the police could talk to him. Tr.6:16. At the meeting he prepared the form and gave the letter to Detective Spellman. Tr.6:19. In the conference room down the hall he stated

---

5 The petitioner testified that he said my boy did that. Tr.7:120

16

the ground rules. Tr.6:21-22.

Special Agent Dominic Colameta testified that he first came in contact with the petitioner in about October of 1996. Tr.6:20. The petitioner was a confidential informant for his office and was being used in an investigation of the Lennox Street Project. Tr.6:21.

At the meeting Vien explained to the petitioner that anything he said during the meeting with Boston police could not be used against him, but they could follow up on the leads. Tr.6:20. The proffer was photocopied and distributed to those at the meeting. Tr.6:27.

At one point the petitioner came out of the conference room and said they won't give me immunity. Tr.6:31. Mitchell went inside to speak to Spellman and Joyce; he came back out and told the petitioner to go back in and do the right thing, and not to lie. Tr.6:32.

Special Agent Steve Mitchell testified that the petitioner was an undercover confidential informant buying narcotics from suspected gang members. Tr.6:48. He arranged a proffer. Tr.6:51. At the meeting he made copies of the proffer and gave one to everyone in the room. Tr.6:53. He had told the petitioner the way a proffer works; anything you say cannot be used against you. Tr.6:56.

Stuart Henry testified that he was a private investigator with McCain Investigative Services, and previously had been with the Secret Service. Tr.6:91-92. He conducted an interview of Karen Valentini and she showed him the vantage points she had from her home. Tr.6:93-95. From the sliding glass doors in the living room he could not see the crosswalk, the sidewalk, or the first level stairs. Tr.6:95-96. From the bedroom he could see the upper platform and the upper staircase; but he could not see the street, crosswalk, sidewalk, or the first level of stairs. Tr.6:96.

Kenyatti Jordan testified that his date of birth was May 6, 1976. Tr.7:40. On the date in

question Jones got a phone call, and the only thing he really heard was Jones say meet at the

school and I'll bring you that. Tr.7:98. After he got off the phone Jones said if he thinks I'm

stupid he's going to get more than a burner next time. Tr.7:99. Jones then grabbed two guns.

Tr.7:99. Jordan thought Jones was going to give Dozier the gun and that then he and Jones would

go meet the two girls. Tr.7:102.

The petitioner said that at the scene he was actually off down a ways from the wall.

Tr.7:103-04. As soon as Dozier got to Jones, Jones started firing shots at him. Tr.7:104. Jones

then stood over Dozier and continued to fire. Tr.7:106. Jones later told him to tell the police

everything that happened except for the shooting. Tr.7:108.

The petitioner testified that he had been making hand to hand buys since April of 1996.

Tr.7:112. Before he spoke with the Boston police, Mitchell told him it was best to tell them what

happened. Tr.7:111. Mitchell said we can protect you. Tr.7:111. Mitchell said we got what they

call a proffer letter; anything you say can't be used directly against you. Tr.7:111. Mitchell asked

him if he was a shooter, and the petitioner told him he wasn't. Tr.7:111.

The petitioner said that he understood the proffer letter. Tr.7:115. He understood that he

was protected; anything he said could not be used against him directly except in cross-

examination. Tr.7:115. At one point he came out of the conference room and said that they won't

give me immunity. Tr.7:116. Mitchell said he was protected, to go back in and do the right thing.

Tr.7:116. He said he didn't feel he needed a lawyer for the April 16th and May 7th statements

because he was still protected under the proffer letter. Tr.7:130.

At the May 7th interview the police told him he had nothing to worry about, and that after

he testified against Jones the feds would put him in someplace nice. Tr.7:131-32. They said that

the feds took good care of him and he should just tell them what they needed to know to put

18

Jones away. Tr.7:132.

## II. Legal Argument

### A. THE TRIAL COURT VIOLATED THE PETITIONER'S DUE PROCESS RIGHTS BY DENYING HIS MOTION TO SUPPRESS.

The prosecution and state court fundamentally misconceived the import of the petitioner's proffer immunity from the United States Attorney's Office for the District of Massachusetts. The motion judge, while basically avoiding the real issues raised by the motion, seemed to believe that Detective Spellman's announcement to the petitioner in the conference room on January 9, 1997 that he did not have authority to offer him any inducements and that "immunity" was a matter for the District Attorney put an end to the problem of the proffer immunity. See Memorandum Of Decision, p.12. However, Detective Spellman's views on the impact of the proffer letter, while interesting (especially since he was unwilling to share them with the federal authorities while he was exploiting their efforts), do not outweigh our constitutional system of government.

In *Murphy v. Waterfront Commission*, 378 U.S. 52 (1964), the Supreme Court rejected the view that it was appropriate to whipsaw a defendant into incriminating himself by immunizing him as a witness in one jurisdiction and then using that statement against him in a different jurisdiction. In the case at bar, the federal prosecutor had statutory authority to give proffer immunity to the petitioner. See *United States Sentencing Guideline,* 1B1.8. One of this guideline's most important functions is to enable federal prosecutors to assure potential informants that their statements will in no way be used against them. See *United States v. Shorteeth*, 887 F.2d 253, 257 (10th Cir. 1989).

He also had the authority to make a promise, and that promise was enforceable as a matter of constitutional law once it was relied on. See *Santobello v. New York*, 404 U.S. 257

(1971).

The Supremacy Clause requires the state to accept federal law. See *Adams v. Maryland*, 347 U.S. 179 (1954). There was a simple solution here. If the Boston police did not want the petitioner given federal proffer immunity, they could have said so since the federal prosecutor was acting to facilitate their interests. Whatever the Boston police told the petitioner in the conference room, the statement he gave them was covered by federal proffer immunity; and, the refusal to suppress that statement was federal constitutional error.

But even assuming arguendo that the proffer letter was unenforceable against state authorities, the statements here could not be found to have been voluntarily made. The motion judge found that AUSA Vien told the petitioner before the interview that anything he said could not be used directly against him. Agent Mitchell testified that he told the petitioner the same thing. Spellman's statement that the police could offer no inducements including immunity could not undo those assurances.

First, Spellman's statement was true; he could not offer immunity. Since Spellman's claim was in fact inapposite to the federal protection the petitioner was given, one cannot presume that the petitioner should have understood the claim to undo his federal proffer immunity. Second, immunity in the state system is starkly different from federal immunity. State immunity is transactional, federal immunity is only use immunity. See *Commonwealth v. Dormady*, 423 Mass. 190, 194 (1996). Since the information Spellman offered the petitioner meant only that the issue of transactional immunity was for another time, one cannot presume that the petitioner should have understood that the information undermined his federal proffer immunity. Third, Spellman's belief that his silence to the federal authorities had accomplished the trick of getting the petitioner to talk without any protection of any kind may provide insight

into Spellman's state of mind; but, it is no evidence of the petitioner's state of mind. If Spellman

had articulated this belief to the petitioner, then he may have undermined the federal assurances.

But, of course, this belief he intentionally kept to himself.

In order for a statement to be admissible, it must be voluntarily given. Over a century ago

the Supreme Court said that in order for a confession to be voluntary it "must not be extracted by

any sort of threats or violence, nor obtained by any direct or implied promises, however slight,

nor by the exertion of any improper influence. *United States v. Bram*, 168 U.S. 532, 542-43

(1897). The *Bram* rule has now been absorbed by and thus diluted by the totality of the

circumstances test. Still, a threat of harm or a promise is a powerful factor that usually tips the

balance, unless the threat or promise is considered acceptable police practice.

In the circumstances of this case where, without the petitioner's statements the

Commonwealth did not have sufficient evidence to get to the jury as a matter of law, it was error

to deny the petitioner's motion for required findings. See Tr.6:10. Not guilty verdicts should be

entered. In the alternative, a new trial is required. The state court decision here was either

contrary to or an unreasonable application of federal constitutional law.

### B. THE TRIAL COURT VIOLATED THE PETITIONER'S FEDERAL CONSTITUTIONAL RIGHTS TO DUE PROCESS OF LAW BY UNFAIRLY RESTRICTING HIS CROSS-EXAMINATION AND HIS EVIDENCE ON MOTIVE AND BIAS OF THE BOSTON DETECTIVES.

The right of confrontation and cross-examination is "an essential and fundamental

requirement for the kind of fair trial which is this country's constitutional goal." *United States v.*

*Caudle*, 606 F.2d 451, 457 (4th Cir. 1979), quoting *Pointer v. Texas*, 380 U.S. 400, 405 (1965);

its denial "calls into question the ultimate integrity of the factfinding process." *Ohio v. Roberts*,

448 U.S. 56, 64 (1980). Parties to a trial are entitled as a matter of right to the reasonable cross-

examination of witnesses against them for the purpose of attempting to impeach or discredit their

testimony. A trial judge may not, consistent with the federal constitutions bar all inquiry into an area of possible bias or motive. See *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).

The right to offer testimony of witnesses is in plain terms the right to present a defense. *Washington v. Texas,* 388 U.S. 14, 19 (1967). In the context of a criminal trial, the Sixth Amendment severely restricts a trial judge's discretion to reject relevant evidence offered by the defense. See *Pettijohn v. Hall*, 599 F.2d 476, 480 (1st Cir.), *cert. denied*, 444 U.S. 946 (1979).

In this case Spellman admitted that he asked to exclude Mitchell and Colameta from the petitioner's interview. The defense wanted to show an improper motive for doing so.

> Q. Was it your concern that in the privacy of this meeting when you started to discuss Miranda issues that Mitchell and Colameta might object to Jordan's testimony?
> Ms. O'Brien: Objection?
> The Court: Sustained. Sustained.

Tr.5:141-42.

When Agent Mitchell testified as a defense witness, the defense again sought to show the jury that the conference room meeting was orchestrated by active deception. Mitchell testified that after the petitioner came out of the room and spoke to him, he went in to speak with Spellman and Joyce. See Tr.7:58. He then said that after they told him only the D.A. could grant immunity, Joyce said that he could trust them on this. Tr. 7:58-59. On the prosecutor's objection, the trial court ruled it out and instructed the jury to disregard it. Tr.7:59.

Alone and in combination these rulings violated the petitioner's due process rights. The state court decision here was either contrary to or an unreasonable application of federal constitutional law.

**III. Conclusion**

For all the foregoing reasons, the petitioner's habeas corpus petition should be granted.

Respectfully submitted,
By his attorney,

Robert L. Sheketoff
BBO No. 457340
One McKinley Square
Boston, MA 02109
(617) 367-3449