UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| KENYATTI JORDAN )<br><br>Petitioner, )<br><br>v. )<br><br>THOMAS REILLY, )<br><br>Respondent. ) | Civil Action No. 04-10925-NG |

## RESPONDENT'S MEMORANDUM OF LAW
## IN OPPOSITION TO PETITIONER'S PETITION FOR
## WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2254

The respondent, Thomas Reilly, hereby submits the following memorandum of law in

opposition to the petition for a writ of habeas corpus filed by the petitioner, Kenyatti Jordan

(hereinafter, "the petitioner"). As is set forth in greater detail below, the petition should be

denied because the petitioner cannot demonstrate that the state court's adjudication of his claims

resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

established Federal law, as determined by the Supreme Court of the United States.

### PRIOR PROCEEDINGS

On April 28, 1997, a Suffolk County grand jury returned an indictment against the

petitioner on charges of first degree murder, in violation of M.G.L. ch. 265, § 1, and unlawful

possession of a firearm, in violation of M.G.L. ch. 269, § 10. *See* Docket Sheet, *Commonwealth

v. Kenyatti Jordan*, Suffolk County Superior Court Criminal Action No. 1997-10285, attached to

the Supplemental Answer, filed previously (hereinafter, "Supp. Ans.") as Exhibit 1.

On October 16, 1997, the petitioner filed a motion to suppress statements. *See* Defendant's Motion to Suppress Statements, Supp. Ans., Exhibit 2. In January of 1998, Justice Robert A. Mulligan of the Massachusetts Superior Court conducted a four-day evidentiary hearing on the motion. *See* Docket Sheet, Supp. Ans., Exhibit 1. On June 9, 1998, Justice Mulligan filed a memorandum denying the motion. *See* Memorandum of Decision on Defendant's Motion to Suppress Statements, Supp. Ans., Exhibit 3.

From January 21 through February 8, 1999, the petitioner was tried by a Suffolk County Superior Court jury, before Justice Vieri Volterra. *See* Docket Sheet, Supp. Ans., Exhibit 1. At the conclusion of that trial, the jury returned verdicts of guilty on both indictments, finding the petitioner guilty of first-degree murder on the theories of premeditation and extreme atrocity or cruelty. *See id.*

On February 23, 1999, the trial judge sentenced the petitioner to the mandatory term of life in prison on the murder conviction, *see* M.G.L. ch. 265, § 2, and to a concurrent term of four to five years in prison on the firearm conviction. *See* Docket Sheet, Supp. Ans., Exhibit 1. The petitioner filed a timely notice of appeal on July 7, 2000. *Id.* The SJC affirmed the defendant's convictions in an opinion dated March 26, 2003. *See Commonwealth v. Jordan*, 439 Mass. 47, 785 N.E.2d 368 (2003), Supp. Ans., Exhibit 6.

## STATEMENT OF FACTS

The SJC's recitation of facts is entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1).[1] *See Coombs v. Maine*, 202 F.3d 14, 18 (1st Cir. 2000); *Avellar v. DuBois*, 30

---

[1] In his memorandum in support of his petition, the petitioner sets forth a statement of facts derived from his reading of the transcript. To the extent that the petitioner's statement of

(continued...)

2

F.Supp.2d 76, 79 (D.Mass. 1998); *Otsuki v. DuBois*, 994 F.Supp. 48, 51 & n.3 (D.Mass. 1998);

*cf. Sumner v. Mata*, 449 U.S. 539, 545-46 (1981)(holding that the presumption of correctness

under former habeas statute applied to "factual determinations made by state courts, whether the

court be a trial court or appellate court"). This deference extends to inferences drawn by the

state court from those factual determinations as well. *See Parke v. Raley*, 506 U.S. 20, 35

(1992); *Flores v. Marshall*, 53 F.Supp.2d 509, 514 (D.Mass. 1999).

The facts of the murder at issue in the state court criminal proceedings may be

summarized as follows:

> In the early evening hours of February 21, 1994, Joseph Dozier was shot and
> killed on the steps in front of Boston Latin Academy in the Roxbury section of
> Boston. His body was riddled with bullets fired from two handguns. More than
> three years later, Kenyatti Jordan was indicted for the killing, and, after a jury
> trial, was convicted of murder in the first degree and possession of a firearm.

*Commonwealth v. Jordan*, 439 Mass. 47, 48, 785 N.E.2d 368 (2003), Supp. Ans., Exhibit 6.

Prior to the petitioner's criminal trial, the Massachusetts Superior Court conducted a

hearing on the petitioner's motion to suppress his statements. *See* Supp. Ans., Exhibits 1, 3, 5.

The SJC found that the evidence presented at the hearing on the motion to suppress included the

following:

> Before trial, Jordan moved to suppress statements he made to Boston detectives
> during their investigation on January 9, 1997, at the office of the United States
> Attorney; on April 16, 1997, at the Bristol County House of Correction; and on
> May 7, 1997, at the same location, immediately after his indictment for Dozier's
> murder. The gravamen of Jordan's complaint is that the statement he made on
> January 9 was induced by a promise made by Federal law enforcement agents (in

---

[1](...continued)
facts conflicts with the findings of the SJC or the Superior Court, the state court's version
controls since the petitioner has not made the required showing of error by clear and convincing
evidence.

the presence of the detectives) that it would not be used against him in the murder investigation. If that promise was not effective, he contends that the inducement was the product of police deception and his resulting statement was involuntary. He further claims that his subsequent statements to the detectives on April 16 and May 7 were either covered by the initial promise of immunity or irremediably tainted by the deception that prompted his statement on January 9.

In the three statements at issue, Jordan denied being involved in the shooting but admitted being present at the shooting, being armed, and being in the company of the person who he claims actually shot Dozier. These statements were pivotal in the homicide investigation and prosecution because, although there had been an eyewitness who had observed two men confront and shoot Dozier, she could not identify the individuals. Consequently, Jordan's admissions, combined with the testimony of the eyewitness that *both* individuals shot the victim, and ballistic evidence that guns of two different calibers were used, formed the core of the Commonwealth's case against him.[2]

The motion prompted a pretrial suppression hearing, at which a number of detectives and Federal law enforcement officers testified. The motion judge made extensive findings of fact regarding the circumstances in which Jordan's statements were made, ultimately concluding that the Commonwealth had sustained its burden of proving beyond a reasonable doubt that they were voluntary and admissible. In reviewing the judge's ruling on voluntariness, we "accept [] the judge's subsidiary findings of fact absent clear error, [and] give[] substantial deference to the judge's ultimate findings and conclusions of law." *Commonwealth v. Vao Sok,* 435 Mass. 743, 751, 761 N.E.2d 923 (2002), *quoting Commonwealth v. Mello,* 420 Mass. 375, 381 n.8, 649 N.E.2d 1106 (1995).

As backdrop to the statements challenged by Jordan, the judge found that Jordan began working as an informant for various Federal and State law enforcement agencies in 1996, making undercover drug purchases in a major drug distribution investigation. When the State police learned that Jordan was a suspect in the 1994

---

[2] In a footnote, the SJC explained:

The only other evidence at trial connecting Jordan to the crime came from an individual who resided in the same halfway house in which Jordan was living on the day of the shooting. He testified that Jordan returned to the house late that evening, watched the news, and when the shooting was reported, stated that "me and my boys did this."

*Commonwealth v. Jordan,* 439 Mass. 47, 49 n.1, 785 N.E.2d 368 (2003), Supp. Ans., Exhibit 6.

4

Dozier homicide, they informed the Federal agents involved in the drug investigation, and ultimately accompanied Jordan to a meeting with Detective Herbert Spellman of the Boston police department on December 10, 1996. Spellman noted that Jordan had been interviewed about the murder in 1994, and had told police that he had had no involvement in it and had been in the company of a friend, Antonio Jones, and a couple of girls the evening it occurred. Jones had been a prime suspect in 1994 after police found ammunition in his apartment matching the spent ammunition found at the scene of Dozier's murder.[3] Spellman asked Jordan whether he was going to continue to provide Jones an "alibi" in the case. Jones responded that he was. The interview concluded.

Jones was also on probation in December, 1996, as the result of other unrelated crimes, and his probation officer was pressing to have his probation revoked because of new arrests. Federal agents had been rebuffed in their efforts to persuade the probation officer to postpone Jordan's revocation proceeding, scheduled for January 3, 1997, so that Jordan could continue working in their drug investigation. As a consequence, sometime after the December 10 meeting between Detective Spellman and Jordan, one of the Federal agents contacted Boston detectives offering Jordan's further help in the Dozier murder investigation in exchange for their intervention on Jordan's behalf in the probation proceedings. This offer led to the fateful meeting in the United States Attorney's office in Boston on January 9, 1997, attended by Federal agents, an assistant United States attorney, the detectives (including Detective Spellman), and Jordan.

The motion judge found that the participants in the meeting approached it from significantly different perspectives. The detectives thought Jordan was involved in the murder and were under the impression that he was prepared to implicate himself. The Federal agents viewed the meeting as an opportunity for Jordan to provide helpful information about the murder so that the detectives would intercede with Jordan's probation officer. The assistant United States attorney began the meeting by typing up a Federal "proffer immunity" letter and explaining that if Jordan told the truth nothing he said could be used against him directly but that the police could follow up on the information. The detectives said nothing in response to the statements of the assistant United States attorney, knew that they had no authority to enter such an agreement, did not sign the letter, and believed

---

[3] The SJC elaborated, in a footnote, that "[t]he police also found photographs of Jordan and Jones in Jones's apartment. The photographs were of them standing together holding guns of the same calibers as the guns used in the killing." *Commonwealth v. Jordan*, 439 Mass. at 50 n.2, Supp. Ans., Exhibit 6.

that the proffer letter had no application to proceedings in State court.[4] The meeting ended and the detectives proceeded to enter a separate room to interview Jordan. The Federal agents were told that, as a matter of police policy, they could not participate in the interview but that Jordan could come out to speak to them whenever he wished.

The interview began by Detective Spellman's explaining that he wanted to speak to Jordan about the killing of Dozier. Spellman informed Jordan that he was a suspect and that he could not offer him any inducements or make any promises, but that he would take anything that Jordan told them to the Suffolk County district attorney. Spellman then took out a card containing the Miranda warnings and went through them one at a time. Jordan stated that he understood each of the rights explained to him. Spellman then asked Jordan if he wanted to talk, and Jordan responded that he wanted to leave the room and talk to one of the Federal agents first, which he did. Jordan told the agent that Spellman said he had "no" immunity. The agent entered the room to talk to Spellman, who told him that only the district attorney could grant immunity. The agent left, conferred with Jordan, and told him to "tell the truth." Jordan returned to the room and agreed to be interviewed. He did not, however, tell the truth. Instead, the judge found that Jordan told a story that he thought would not be self-incriminating. In essence, he told the detectives that he had been with Jones on the night of the murder; that Jones had received a telephone call to meet someone and asked Jordan to come along; that he did not know what the meeting was to be about; and that he remained far away when Jones met Dozier in front of Boston Latin Academy. Jordan did admit, however, that he saw Jones shoot Dozier and that he and Jones had then fled the scene together. Jordan further told the detectives that Jones went to the meeting armed with two handguns, and that although he, Jordan, also was armed, he did not fire his gun. The interview then ended.

With regard to this critical meeting between Jordan and the detectives, the judge concluded that whatever impression Jordan may have had about the effect of the "proffer immunity" letter when he initially entered the interview room with the detectives, before he agreed to be interviewed he knew that "it did not provide protection from the use of anything he might say against him in state court." The judge also found that the interview was noncustodial, that Jordan was informed of and fully understood his Miranda rights, that the interrogation was not coercive, that Jordan was alert and lucid and had had extensive experience in the criminal justice system, and that he acted in a calculated way, hoping to provide enough information to avoid a probation revocation (and incarceration) without

---

[4] The SJC explained that "[t]he assistant United States attorney signed the letter, and Jordan by his signing acknowledged and agreed to its content." *Commonwealth v. Jordan*, 439 Mass. at 51 n.3, Supp. Ans., Exhibit 6.

incriminating himself in the crime. The judge ultimately concluded that Jordan's
statement to the detectives on January 9 was a "product of his free will and
rational intellect and was voluntary."

*Commonwealth v. Jordan*, 439 Mass. at 48-52, Supp. Ans., Exhibit 6.

The petitioner also claimed, on appeal, that his right to confrontation and cross-

examination under the Sixth Amendment was violated by the trial judge's decision to exclude

certain testimony from Detective Spellman and from one of the federal agents who was present at

the January 9, 1997 meeting. The SJC found the following facts as to the petitioner's claims

regarding cross-examination:

    *A.*    *Detective Spellman*

The SJC found:

At trial, Detective Spellman was cross-examined extensively regarding his
conduct at the January 9 meeting in the United States Attorney's Office and in the
interview of Jordan that took place immediately thereafter. This cross-
examination included a line of inquiry directed at exposing Spellman's attitude
toward the Federal agents and his reasons for keeping them out of the interview
room during his interview of Jordan. Spellman testified that he kept his opinion
about the ineffectiveness of the "proffer letter" with respect to the State court
proceedings to himself at the meeting; that he made no comments to the assistant
United States attorney about it; that, although he had neglected to bring a Miranda
waiver form to the meeting, he chose not to ask the Federal agents to supply him
one;[5] and that the "policy that he cited in asking the Federal agents not to be
present during the interview was not an official, written policy of the Boston
police department. Spellman also testified that he was not concerned that Jordan
would "clam up" if the Federal agents were present during the interview, but did
not want Jordan to feel like he was being "gang[ed] up" by the presence of more
than two investigators.

Defense counsel then asked Spellman, "Was it your concern that in the privacy of
this meeting when you started to discuss Miranda issues that [the Federal agents]

---

    [5] The SJC noted that "Spellman also testified, however, that just before he entered the
interview room he told the assistant United States attorney that he intended to advise Jordan of
his Miranda rights." *Commonwealth v. Jordan*, 439 Mass. at 54 n.5, Supp. Ans., Exhibit 6.

might object to Jordan's testimony?" The prosecutor objected and the judge
sustained the objection. Jordan claims that the judge's action in sustaining the
objection violated his constitutional right to confront and cross-examine witnesses
against him.

*Commonwealth v. Jordan*, 439 Mass. at 54-55, Supp. Ans., Exhibit 6.

B.    *The Federal Agent*

With respect to the petitioner's complaint about the cross-examination of the federal

agent, the SJC found:

> Jordan also complains that he was unfairly restricted in his direct examination of
> one of the Federal agents who was present outside of the interview room on
> January 9. That agent testified as to what occurred at the meeting in the United
> States Attorney's office and to a conversation he had with Jordan when Jordan left
> the interview room and told him that the detectives were saying that he had no
> immunity. The agent testified that he went into the room, without Jordan, and
> was told by the detectives that only the district attorney could agree to immunity.
> He then testified that one of the detectives (not Spellman) said, "You know, you
> can trust us on this." The prosecutor objected and the judge struck the answer.
> Defense counsel voiced no objection to the ruling.

*Commonwealth v. Jordan*, 439 Mass. at 55, Supp. Ans., Exhibit 6.

## ARGUMENT

**The Petitioner Is Not Entitled to Habeas Corpus Relief Where the Supreme Judicial
Court's Adjudication of His Claims Was Not Contrary To, or an Unreasonable Application
Of, Clearly Established Supreme Court Law.**

In his petition, the petitioner claims that his right against self-incrimination under the

Fifth Amendment was violated by the admission at his trial of statements which were allegedly

involuntary and were allegedly made after a promise of immunity. *See* Petition, ¶ 12A. The

petitioner further claims that his right to confront witnesses against him, pursuant to the Sixth

Amendment, was violated when the trial judge (a) declined to let defense counsel ask a particular

question of Detective Herbert Spellman and (b) excluded a statement made by a federal agent

8

who was present at the January 9, 1997, meeting. *Id.,* ¶ 12B. A review of the state court record and the SJC's decision show, however, that the SJC fully evaluated these claims, and that the SJC's decision was neither contrary to nor an unreasonable application of controlling Supreme Court authority on these issues.

I.    **Standard of Review**

Since the instant petition was filed after the effective date of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), this Court's review is governed by that act. *Lindh v. Murphy*, 521 U.S. 320, 336 (1997). *See also* 28 U.S.C. § 2254. AEDPA "places a new constraint on the power of a federal habeas court to grant a state petitioner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court." *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Williams v. Matesanz*, 230 F.3d 421, 426 (1st Cir. 2000)(overruled on other grounds by *McCambridge v. Hall*, 303 F.3d 24 (1st Cir. 2002))("a federal [habeas] court operates within a closely circumscribed sphere"). As the Supreme Court recently reiterated, AEDPA requires a "'highly deferential standard for evaluating state-court rulings' . . . which demands that state court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 23 (2002)(*per curiam*), quoting *Lindh*, 521 U.S. at 333, n.7. In relevant part, AEDPA precludes a federal court from granting habeas relief, unless the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or was based on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *See* 28 U.S.C. §2254(d)(1-2); *see also Tyler v. Cain*, 533 U.S. 656, 660 (2001). In addition, under AEDPA, state court determinations of factual

issues "shall be presumed to be correct" unless the petitioner rebuts this "presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Coombs*, 202 F.3d at 18.

    A.    <u>The "Contrary To" Prong</u>

A state court decision is "contrary to" clearly established Supreme Court precedent in only two circumstances: (a) where "the state court applies a rule that contradicts the governing law set forth in" Supreme Court cases or (b) where "the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent." *Williams v. Taylor,* 529 U.S. at 405-06. Under either scenario, in order to fall within the "contrary to" clause, the state court decision must be "substantially different," diametrically different," "opposite in character or nature," or "mutually opposed" to clearly established Supreme Court law. *Id.*

    B.    <u>The "Unreasonable Application Of" Prong</u>

A state court decision involves an "unreasonable application" of Supreme Court precedent "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Williams v. Taylor*, 529 U.S. at 407-09, 413. Merely that the state court reached an incorrect result is not sufficient -- the result also must be unreasonable. *L'Abbe v. DiPaolo*, 311 F.3d 93, 96 (1st Cir. 2002), *citing Williams v. Taylor*, 529 U.S. at 411; *see also McCambridge v. Hall*, 303 F.3d 24, 36-37 (1st Cir. 2002)(en banc)("'some increment of incorrectness beyond error is required' . . . The increment need not necessarily be great, but it must be great enough to make the decision unreasonable in the independent and objective judgment of the federal court"),

*quoting Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000). Where, for instance, the state court reaches a result that is "devoid of record support for its conclusion or is arbitrary," the unreasonable application prong likely will be satisfied. *McCambridge*, 303 F.3d at 37, *citing O'Brien v. DuBois*, 145 F.3d 16, 25 (1st Cir. 1998). *See also Kibbe v. DuBois*, 269 F.3d 26, 35 (1st Cir. 2001), *cert. denied*, 535 U.S. 960 (2002); *Hurtado v. Tucker*, 245 F.3d 7, 16 (1st Cir.), *cert. denied*, 534 U.S. 925 (2001). In order for a federal habeas court to find that the "unreasonableness" prong has been met, the state court's determination of either the law or the facts must be *objectively* unreasonable. *See Williams v. Taylor*, 529 U.S. at 411; *Williams v. Matesanz*, 230 F.3d at 426-27; *Torres v. Prunty*, 223 F.3d 1103, 1108 (9th Cir. 2000).

There is no bright-line rule as to what constitutes an "objectively unreasonable" application of federal law or determination of facts. *Williams v. Taylor*, 529 U.S. at 410 ("[t]he term 'unreasonable' is no doubt difficult to define"). As the Supreme Court has made clear, however, an incorrect state court determination is not necessarily an unreasonable one. *Id.* ("the most important point is that an unreasonable application of federal law is different from an *incorrect* application of federal law")(emphasis in original). It is well-settled that "a federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application [or determination] must also be unreasonable." *Id.* at 411.

## II. The SJC's Decision That the Petitioner's Statements Were Voluntary and Were Not Admitted in Violation of Any Immunity Agreement Was Not Contrary To, or an Unreasonable Application Of, Clearly Established Supreme Court Law.

It is beyond question that before a person in custody may be questioned by authorities, he must be warned of his right against self-incrimination and his right to the presence of an attorney.

11

*Miranda v. Arizona*, 384 U.S. 436, 444, 467-68 (1966). A defendant may, however, waive his

rights, "provided the waiver is made voluntarily, knowingly and intelligently," and the

government bears the "heavy burden" of proving that the defendant knowingly and intelligently

waived his rights under *Miranda*. *Id.* at 444, 475 (citing *Escobedo v. Illinois*, 378 U.S. 478, 490

n.14 (1964)).

The Supreme Court has made clear that waiver of the right against self-incrimination

need not be express, but may be implied. *North Carolina v. Butler*, 441 U.S. 369, 373

(1979)(where defendant was given *Miranda* rights orally later declined to sign a written waiver,

but agreed to talk to FBI agents, defendant held to have impliedly waived *Miranda* rights). As

the Supreme Court stated in *North Carolina v. Butler*:

> An express written or oral statement of waiver of the right to remain silent or of
> the right to counsel is usually strong proof of the validity of that waiver, but is not
> inevitably either necessary or sufficient to establish waiver. The question is not
> one of form, but rather whether the defendant in fact knowingly and voluntarily
> waived the rights delineated in the *Miranda* case. . . . The courts must presume
> that a defendant did not waive his rights; the prosecution's burden is great; but in
> at least some cases waiver can be clearly inferred from the actions and words of
> the person interrogated.

*Butler*, 441 U.S. at 373. *Accord Bui v. Di Paola*, 170 F.3d 232, 240 (1st. Cir. 1999), *cert. denied*

529 U.S. 1086, 120 S.Ct. 1717, 146 L.Ed.2d 640 (2000)("an express statement is not invariably

necessary to support a finding that the defendant waived either the right to remain silent or the

right to counsel"); *United States v. Garcia*, 983 F.2d 1160, 1169 (1st Cir. 1993).

Under the implied waiver rule, the question whether there has been a knowing and

intelligent waiver of *Miranda* rights must be determined on the "particular facts and

circumstances surrounding that case, including the background, experience, and conduct of the

12

accused." *Butler*, 441 U.S at 374-75 (internal quotations omitted). *Accord Garcia*, 983 F.2d at

1169 ("in considering whether a defendant has voluntarily relinquished his Fifth Amendment

rights, [a court] must examine the 'totality of the circumstances surrounding the interrogation'").

Absent the "crucial element of police overreaching," there is "simply no basis for concluding that

any state actor has deprived a criminal defendant of due process of law." *Colorado v. Connolly*,

479 U.S. 157, 163-64 (1986).

In the instant case, the SJC found that:

> With regard to this critical meeting [on January 9, 1997] between Jordan and the
> detectives, the judge concluded that whatever impression Jordan may have had
> about the effect of the "proffer immunity" letter when he initially entered the
> interview room with the detectives, before he agreed to be interviewed he knew
> that "it did not provide protection from the use of anything he might say against
> him in state court." The judge also found that the interview was noncustodial,
> that Jordan was informed of and fully understood his Miranda rights, that the
> interrogation was not coercive, that Jordan was alert and lucid and had had
> extensive experience in the criminal justice system, and that he acted in a
> calculated way, hoping to provide enough information to avoid a probation
> revocation (and incarceration) without incriminating himself in the crime. The
> judge ultimately concluded that Jordan's statement to the detectives on January 9
> was a "product of his free will and rational intellect and was voluntary."
>
> The judge's findings of fact regarding the circumstances in which Jordan's
> statement was taken are supported by the evidence adduced at the hearing on the
> motion to suppress. His conclusion, based on an examination of the totality of the
> circumstances, that Jordan's statement was voluntary and properly obtained, is, in
> turn, fully supported by the judge's findings of fact. It is also consistent with our
> holdings in cases involving statements made during police interrogations in which
> discussions regarding cooperation or lenience may have occurred. *Compare
> Commonwealth v. Mandile*, 397 Mass. 410, 414-15, 492 N.E.2d 74 (1986)(police
> statements that cooperation would be brought to the attention of the district
> attorney did not render confession involuntary) and *Commonwealth v. Williams*,
> 388 Mass. 846, 855, 448 N.E.2d 1114 (1983)(same), *with Commonwealth v.
> Meehan*, 377 Mass. 552, 564-65, 387 N.E.2d 527 (1979), *cert. dismissed*, 445
> U.S. 39, 100 S.Ct. 1092, 63 L.Ed.2d 185 (1980)(confessions involuntary where
> induced by police statements that confession would "help" defense, and that
> "truth" was going to be a "good defense"). The touchstone is whether the police

assured the defendant that his confession would aid his defense or result in a lesser sentence. *Id.* at 564, 387 N.E.2d 527. The judge's findings of fact make clear that such was not the case here.

Contrary to Jordan's argument on appeal, the Federal "proffer immunity" letter and its terms were not binding on the Commonwealth. Neither the Commonwealth, the Suffolk County district attorney's office, nor the Boston police department was a party or signatory to the letter. Moreover, Jordan was not deceived or misled regarding its effect in the State criminal proceedings. *See Commonwealth v. Groome*, 435 Mass. 201, 216-17 n.21, 755 N.E.2d 1224 (2001)(police deception can eviscerate voluntariness of defendant's statement). The judge found that Jordan knew the letter had no legal or practical effect in the State proceedings at the time he made his statement. These findings are supported by the testimony regarding the January 9 meeting and further borne out by Jordan's statements made to other detectives in an interview occurring on April 16. In that interview, arranged without Federal assistance, and tape recorded in part, Jordan confirmed that he was aware on January 9 that what he was telling the detectives was not protected from use in State court proceedings, and that he had spoken to them because he was tired of being suspected of something he did not do. Although some of the circumstances of the January 9 meeting may have been unusual, the judge's findings make clear that the detectives accurately advised Jordan of the unrestricted basis on which his statement was being sought before the interview began, and Jordan was fully cognizant of that fact when he agreed to proceed. While Jordan may have miscalculated his ability to manipulate the situation to his advantage, his statement was voluntary and not the product of deception on the part of the Commonwealth.

Because Jordan's challenge to his January 9 statement fails, his allegations of either immunity or taint regarding the statements he subsequently made to Boston detectives on April 16 and May 7 also fail.[6] Each of those statements was preceded by Miranda warnings, properly given, fully understood, and waived. Each statement was progressively more inculpatory. In his final statement, while

---

[6] The SJC noted:

The motion judge concluded that, even if the January 9 statement had been involuntary, the subsequent April 16 and May 7 statements would have been admissible because they met both the "cat out of the bag" and the "break in the stream" tests set forth in *Commonwealth v. Smith*, 412 Mass. 823, 833-34 n.9, 593 N.E.2d 1288 (1992). Although we do not need to reach these issues, we agree with the judge's conclusion.

*Commonwealth v. Jordan,* 439 Mass. at 54 n.4, Supp. Ans., Exhibit 6.

still denying that he shot Dozier, Jordan admitted to being right next to Jones when the shooting occurred; knowing that Jones intended to shoot Dozier at the meeting; and understanding that Jones expected Jordan to shoot Dozier as well.

*Commonwealth v. Jordan,* 439 Mass. at 53-54, Supp. Ans., Exhibit 6.

In light of the SJC's careful and accurate analysis of the issues regarding the voluntariness of the statement and the effect of the discussions regarding immunity, the SJC's decision cannot be said to be either contrary to or an unreasonable application of established Supreme Court precedent. *See McCambridge,* 303 F.3d at 37. The petitioner's attempt to show a departure from Supreme Court precedent by relying on *Murphy v. Waterfront Commission,* 378 U.S. 52 (1964), is misplaced.[7] In *Murphy,* the Supreme Court held that testimony that a defendant is compelled to give pursuant to a grant of immunity in one jurisdiction cannot be used against him in any other jurisdiction. *Id.* at 79. The holding of *Murphy* is inapplicable to this case since the petitioner was never compelled to make any statements. *See generally, Commonwealth v. Jordan,* 439 Mass. at 48-55, Supp. Ans., Exhibit 6. To the contrary, the police

---

[7] Likewise, the petitioner's reliance on *United States v. Shorteeth,* 887 F.2d 253, 257 (10th Cir. 1989) and on the United States Sentencing Guideline, 1B1.8, are also misplaced. The question for the federal court on habeas review is not whether there is another possible outcome to the question addressed by the state court; rather, the federal court reviews the state court's decision to ensure that it is not "contrary to" or an "unreasonable application of" established Supreme Court precedent. *See McCambridge,* 303 F.3d at 37. While the federal sentencing guidelines and the Tenth Circuit Court of Appeals may offer insight into different ways the immunity question could be viewed, they do not form the basis for any claim that the SJC's decision went against established Supreme Court precedent.

Moreover, even assuming that Section 1B1.8 of the sentencing guidelines could be found to constitute Supreme Court precedent, that section of the federal sentencing guidelines is inapplicable to this case. Section 1B1.8 merely prevents federal authorities from using information obtained pursuant to a cooperation agreement in calculating the cooperating defendant's sentence under the federal sentencing guidelines. *See* United States Sentencing Guideline, 1B1.8; *United States v. Shorteeth,* 887 F.2d 253, 257 (10th Cir. 1989). Since the federal sentencing guidelines have no applicability to this case, Section 1B1.8 has no bearing on this matter.

advised the petitioner prior to each of the statements he gave in 1997 that he retained the right to

remain silent. *See id; compare Murphy*, 378 U.S. at 53-54, 80 (defendants were compelled to

testify before state grand jury or be held in contempt).   Accordingly, *Murphy* has no bearing on

this case, and the petitioner cannot point to any clearly established federal law, as determined by

Supreme Court precedent, which is contravened by the SJC's decision.  Under AEDPA, the key

question is not whether this Court concludes that the Commonwealth had shown that the

petitioner's statements were the product of a voluntary waiver of his rights, but rather whether

the state court decision is arbitrary and without support in the record, reaching an "increment of

incorrectness beyond error . . . great enough to make the decision unreasonable in the

independent and objective judgment of the federal court." *McCambridge*, 303 F.3d at 37.  Since

the petitioner cannot show that the SJC's decision was contrary to or an unreasonable application

of any federal law as clearly established by Supreme Court precedent, his claim for federal

habeas relief must fail.

**III.    The SJC's Decision with Respect to the Petitioner's Rights of Confrontation and Cross-Examination Was Not Contrary To, or an Unreasonable Application Of, Clearly Established Supreme Court Law.**

The petitioner claims that the state court denied him his Sixth Amendment right to

confrontation where the trial judge (a) declined to allow defense counsel to ask a particular

question of Detective Spellman and (b) excluded a statement from a federal agent who was

present at the January 9, 1997, meeting.  The petitioner's habeas petition must be dismissed,

however, because the trial judge's evidentiary rulings were questions of state law, and matters of

state law cannot furnish the basis for federal habeas relief. *See Estelle v. McGuire*, 502 U.S. 62,

67-68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991); *Lewis v. Jeffers*, 497 U.S. 764, 780, 110 S.Ct.

3092, 111 L.Ed.2d 606 (1990). Moreover, the petition must be denied because the SJC has

rejected the petitioner's claim, and the SJC's decision on this matter was neither contrary to nor

an unreasonable application of Supreme Court precedent. *See Commonwealth v. Jordan,* 439

Mass. 47 (2003), Supp. Ans., Exhibit 6.

A.    The Petitioner's Claim Regarding the Trial Judge's Evidentiary Rulings Is a
      Question of State Law, and Thus Cannot Form the Basis for Federal Habeas
      Corpus Relief.

Errors of state law do not provide a basis for federal habeas corpus relief. *Estelle,* 502

U.S. at 67-68; *Lewis,* 497 U.S. at 780. It is not the province of a federal habeas court to

reexamine state court determinations of state law questions. *Lewis,* 497 U.S at 780-81. In other

words, this Court does not have jurisdiction in the federal collateral attack of the petitioner's state

court conviction to review a claimed error of a State's evidentiary law. A federal court may

issue a writ of habeas corpus only when a conviction violates the constitution, laws, or treaties of

the United States. *Estelle,* 502 U.S. at 67-68; 28 U.S.C. §§ 2241, 2254. "Even if an error of

state law could be sufficiently egregious to amount to a denial of equal protection or of due

process of law guaranteed by the Fourteenth Amendment," a federal court may not issue a writ to

redress such a deprivation if the claims are merely ancillary to perceived errors of state law.

*Pulley v. Harris,* 465 U.S. 37, 41, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). *See also Adelson v.*

*DiPaola,* 131 F.3d 259, 262 n.3 (1st Cir. 1997); *Hamm v. Latessa,* 72 F.3d 947 (1st Cir. 1995),

*cert. denied,* 519 U.S. 947 (1996); *Pitts v. Lockhart,* 911 F.2d 109, 111-12 (8th Cir. 1990), *cert.*

*denied,* 501 U.S. 1253 (1991)(petitioner's claims that he was deprived of due process and equal

protection were not grounds for habeas relief where his conviction was obtained in contravention

of state law, no matter how "serious and fundamental the error" may have been).

Here, the petitioner claims that the trial court's exclusion of the evidence he sought to elicit from Detective Spellman and from the federal agent deprived him of his right to present a defense in violation of the Sixth Amendment. While the petitioner is correct that he has a right to present a defense as guaranteed by the Sixth Amendment, he overlooks the fact that his Sixth Amendment right "does not abrogate the trial judge's role as gatekeeper at trial." *See Neverson v. Bissonnette,* 242 F.Supp.2d 78, 86 (D.Mass. 2003). Massachusetts law requires that a trial judge acts as a gatekeeper "to determine whether testimony is relevant, probative, and not unfairly prejudicial." *See id, citing Anthony's Pier Four, Inc. v. HBC Associates,* 411 Mass. 451, 477, 583 N.E.2d 806 (1991); *Commonwealth v. D'Agostino,* 344 Mass. 276, 279, 182 N.E.2d 133 (1962); *Commonwealth v. Burke,* 339 Mass. 521, 534, 159 N.E.2d 856 (1959), *overruled on other grounds by Commonwealth v. Beldotti,* 409 Mass. 553, 567 N.E.2d 1219 (1991). *See also Commonwealth v. Kirkpatrick,* 423 Mass. 436, 447-48, 668 N.E.2d 790, 797 (1996); *Commonwealth v. Benoit,* 410 Mass. 506, 520, 574 N.E.2d 347, 355 (1991); *Commonwealth v. United Books, Inc.,* 389 Mass. 888, 895-96, 453 N.E.2d 406, 415 (1983).

In this case, the decisions whether to allow the particular question to Detective Spellman and whether to exclude the remark made by the federal agent were purely within the discretion of trial judge. The trial judge, under Massachusetts law, had an obligation to act as a gatekeeper with respect to evidentiary matters such as relevance and bias. As such, these decisions were matters of state evidentiary law, not implicating the Constitution. These rulings cannot, therefore, form the basis of a claim for federal habeas relief. *See Salemme v. Ristaino,* 587 F.2d 81, 85 (1st Cir. 1978) ("[h]abeas relief is unavailable to persons solely on the basis of alleged errors in evidentiary rulings")

18

B.    The SJC's Ruling as to the Petitioner's Sixth Amendment Claims Was Neither
Contrary to Nor an Unreasonable Application of Established Supreme Court
Precedent.

The SJC's decision that the petitioner's Sixth Amendment rights had not been violated by

the trial court's evidentiary rulings was neither contrary to nor an unreasonable application of

federal law as established by the United State Supreme Court. As to the cross-examination of

Detective Spellman, the SJC found:

> While the Sixth Amendment to the United States Constitution may restrict the
> discretion of a trial judge to reject relevant evidence offered by a defendant,
> *Pettijohn v. Hall*, 599 F.2d 476, 480 (1st Cir.), *cert. denied*, 444 U.S. 946, 100
> S.Ct. 308, 62 L.Ed.2d 315 (1979), it had long been recognized that a defendant's
> right to cross-examine a witness is not absolute. *Commonwealth v. Doherty*, 394
> Mass. 341, 349-50, 476 N.E.2d 169 (1985). As long as the judge does not
> completely bar inquiry into a relevant subject he has broad discretion to limit the
> scope and extent of the inquiry. *Commonwealth v. Jackson*, 419 Mass. 716, 727,
> 647 N.E.2d 401 (1995). The judge did not abuse his discretion here. To the
> extent that the question was relevant to bias or credibility, it was only marginally
> so and was cumulative. To the extent that it sought to elicit Spellman's
> speculation on what might have happened if he had allowed the Federal agents to
> be present, it was immaterial to the voluntariness of Jordan's statements. There
> was no error.

*Commonwealth v. Jordan*, 439 Mass. at 55, Supp. Ans., Exhibit 6.

The SJC's decision is wholly in keeping with established Supreme Court precedent.

While the petitioner asserts that the SJC's decision to uphold the judge's ruling constitutes an

unreasonable application of *Washington v. Texas*, 388 U.S. 16 (1967), this assertion is simply

erroneous.[8] The present case does not involve a situation where the court excluded highly

_____

[8] As is set forth below, Supreme Court case law pertaining to alleged violations of the
right to present a defense does not lend itself to any strict rules, but rather depends upon the facts
unique to each case. *See Washington v. Texas*, 388 U.S. 16 (1967). As such, it cannot be
claimed that the SJC's decision was "contrary to" Supreme Court precedent, and the petitioner's
argument must depend on the assertion that the SJC's decision was an "unreasonable

(continued...)

relevant and trustworthy evidence, and thus "significantly undermin[ed] fundamental elements of the defendant's defense." *United States v. Scheffer*, 523 U.S. 303, 315 (1998). Rather, this case involves a decision to exclude evidence which was found to be minimally relevant and cumulative, and this decision "did not create a substantial risk of a miscarriage of justice." *See Commonwealth v. Jordan*, 439 Mass. at 55, Supp. Ans., Exhibit 6. As such, the instant case can be easily distinguished from the *Washington* case.

In *Washington*, the petitioner had been convicted of fatally shooting another man. 388 U.S. at 15. The petitioner in that case testified at his trial that another person, Charles Fuller, actually committed the murder. *Id.* at 16. Had Fuller been allowed to testify at Washington's trial, Fuller would have testified that he committed the murder and that Washington had tried to stop the shooting. *Id.* Fuller was not permitted to testify, however, because two Texas statutes prohibited co-participants in the same crime from testifying for one another (although they could testify for the State). *Id.* at 23. The Supreme Court found that the statutes were not designed to cull out unreliable testimony, but instead arbitrarily banned an entire group of potential defense witnesses. *Id.* at 22-23. The Court therefore reversed Washington's conviction, holding that "arbitrary rules [which] prevent whole categories of defense witnesses from testifying on the basis of *a priori* categories that presume them unworthy of belief" violate the Sixth Amendment right to present a defense.

The instant case differs substantially from *Washington* in that the petitioner was not precluded from offering testimony on a particular theory of defense, or even denied the

---

[8](...continued)
application" of such precedent. *See id.*

opportunity to question any particular witness. *See Commonwealth v. Jordan*, 439 Mass. at 55,

Supp. Ans., Exhibit 6; *see also Neverson*, 242 F.Supp.2d at 86. Rather, the petitioner was merely

denied the opportunity to ask Detective Spellman one question, which pertained to a subject area

on which he had already been extensively cross-examined. The SJC found that "[t]o the extent

that the question was relevant to bias or credibility, it was only marginally so and was

cumulative. *Commonwealth v. Jordan*, 439 Mass. at 55, Supp. Ans., Exhibit 6. As such, it

presents a scenario wholly different from that set forth in *Washington*. *See Washington*, 388

U.S. at 16.

The respondent does not dispute that the petitioner has a right to cross-examine witnesses

for bias. *Delaware v. Van Arsdall*, 475 U.S. 673, 678-79 (1986); *see also Davis v. Alaska*, 415

U.S. 308, 315 (1974). It cannot be disputed, however, that this right is limited. As the Supreme

Court has noted:

> It does not follow, of course, that the Confrontation Clause of the Sixth
> Amendment prevents a trial judge from imposing any limits on defense counsel's
> inquiry into the potential bias of a prosecution witness. On the contrary, trial
> judges retain wide latitude insofar as the Confrontation Clause is concerned to
> impose reasonable limits on such cross-examination based on concerns about,
> among other things, the witness' safety, or interrogation that is repetitive or only
> marginally relevant. And as we observed earlier this Term, "the Confrontation
> Clause guarantees an *opportunity* for effective cross-examination, not cross-
> examination that is effective in whatever way, and to whatever extent the defense
> might wish." *Delaware v. Fensterer,* 474 U.S. 15, 20 (1985)(per
> curiam)(emphasis in original).

*Delaware v. Van Arsdall*, 475 U.S. at 679. "Cross-examination, to pass muster under the

confrontation clause, does not have to be a perfect cross-examination." *Commonwealth v. Tanso*,

411 Mass. 640, 648, 583 N.E.2d 1247, *cert. denied*, 505 U.S. 1221, 112 S.Ct. 3033, 120 L.Ed.2d

902 (1992).[9] Accordingly, the trial judge's decision to limit the cross-examination of Detective

Spellman did not violate the petitioner's Sixth Amendment rights.

Similarly, the SJC's decision with respect to the testimony of the federal agent is not

contrary to or an unreasonable application of established Supreme Court precedent. With respect

to the exclusion of the statement from the federal agent, the SJC found that:

> Jordan also complains that he was unfairly restricted in his direct examination of
> one of the Federal agents who was present outside of the interview room on
> January 9. That agent testified as to what occurred at the meeting in the United
> States Attorney's office and to a conversation he had with Jordan when Jordan left
> the interview room and told him that the detectives were saying that he had no
> immunity. The agent testified that he went into the room, without Jordan, and
> was told by the detectives that only the district attorney could agree to immunity.
> He then testified that one of the detectives (not Spellman) said, "You know, you
> can trust us on this." The prosecutor objected and the judge struck the answer.
> Defense counsel voiced no objection to the ruling.
>
> [T]he judge did not abuse his discretion. The detective's statements were not
> made in Jordan's presence nor were they conveyed to him. Even if we were to
> conclude that the judge should have permitted this testimony to stand, his ruling
> striking it did not create a substantial likelihood of a miscarriage of justice. The
> jury had before them the testimony of numerous witnesses called by both parties
> from which they could fairly judge the voluntariness of the statement Jordan gave
> to the detectives on January 9.

*Commonwealth v. Jordan*, 439 Mass. at 55, Supp. Ans., Exhibit 6.

In light of the foregoing, the SJC's decision that the petitioner's right to confrontation and

cross-examination was not violated by the trial judge's evidentiary rulings was, at the very least,

objectively reasonable. The SJC's denial of the petitioner's appeal of his conviction was not,

therefore, either contrary to or an unreasonable application of clearly established federal law as

---

[9] The analysis of Confrontation Clause requirements under Massachusetts law mirrors
that of federal law as established by the Supreme Court because "[t]he confrontation clauses of
the Massachusetts Declaration of Rights and of G.L. c. 263, § 5, are equivalent to that of the
Sixth Amendment." *Commonwealth v. Childs*, 413 Mass. 252, 260, 596 N.E.2d 351 (1992).

determined by the Supreme Court, and thus the petition should be dismissed. *See McCambridge,*

303 F.3d at 37.

## CONCLUSION

For the foregoing reasons, the respondent requests that this Court deny the petition for a

writ of habeas and dismiss the petitioner's complaint in its entirety.

Respectfully submitted,

THOMAS F. REILLY,
ATTORNEY GENERAL

Maura D. McLaughlin
Assistant Attorney General
Criminal Bureau
One Ashburton Place
Boston, Massachusetts 02108
(617) 727-2200, ext. 2857
BBO # 634923

Dated: July 15, 2004

23

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon counsel for the petitioner, Kenyatti Jordan, on July 15, 2004, by depositing the copy in the office depository for collection and delivery by first-class mail, postage pre-paid, as follows: Robert L. Sheketoff, Attorney at Law, One McKinley Square, Boston, Massachusetts, 02109.

Maura D. McLaughlin