UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

KENYATTI JORDAN,                )
    Petitioner,             )
                            )
    v.                      )    C.A. No. 04-10925-NG
                            )
THOMAS REILLY,                  )
    Respondent.             )

GERTNER, D.J.:

**MEMORANDUM AND DECISION RE: PETITION FOR WRIT OF HABEAS CORPUS**
December 22, 2005

Petitioner Kenyatti Jordan ("Jordan") has filed a habeas petition with this Court challenging the state's use of incriminating remarks Jordan made to law enforcement officials between January 9, 1997 and May 7, 1997. Jordan challenges the use of these statements on two grounds. First, he alleges that one of the incriminating statements used to obtain his conviction was subject to a proffer agreement[1] between himself and a federal prosecutor. In the alternative, Jordan asserts that all of the incriminating statements he made were obtained illegally because the government led him to believe that he had complete immunity,

---

[1] According to Assistant United States Attorney George Vien, who prepared the proffer letter at issue in this case, a proffer letter affords the following: "A proffer letter is a letter that we give. . . to anyone that wants to come in and talk to us who is hesitant about implicating themselves in criminal activity. The letter says, in substance, that we won't use what they tell us directly against them. However, we are free to follow up on any leads. And. . . if they ever give false testimony at any kind of hearing, then we can use what they said directly to us. [For example] if a person comes in and under a proffer letter tells us that he robbed a bank with Joe, we can't bring into court his admission that he robbed a bank with Joe. However, we can go interview Joe and if Joe implicated him in the bank robbery, then he can be prosecuted for that bank robbery. . . It's not an immunity letter, it's a proffer letter." Commonwealth v. Jordan, Suffolk County Super. Ct., No. 97-10285, Mot. to Suppress Hr'g (hereinafter "Suppression Hr'g"), January 14, 1998, at 18.

even with respect to the state prosecution.  Jordan also makes a related claim that his Sixth Amendment rights to confrontation and cross-examination were violated when the trial judge restricted the defense's cross-examination of two law enforcement officers who were present on the day that Jordan made the incriminating statements in question.

Given the frequency with which the federal government now prosecutes acts that had formally been considered state crimes and the frequency with which state and federal authorities cooperate in joint federal-state task forces, the facts of the instant case are especially troubling.  The facts are reminiscent of a "bait and switch" game, the federal authorities gaining access to the petitioner through promises of immunity, and the state authorities capitalizing on those promises, but coyly not joining them.

The problem is that I do not address these issues on a *tabula rasa*.  This is a federal habeas petition in which I am called upon to review decisions of the state courts under the AEDPA. 28 U.S.C. § 2254.  And under the AEDPA, Jordan is not able to rebut the heavy presumption of correctness to which the state court's findings of law and fact are entitled.  Therefore, I **DENY** Jordan's petition for habeas corpus relief.

I.    **BACKGROUND**

On February 8, 1999, Kenyatti Jordan was convicted of first degree murder – based on premedition and extreme atrocity or cruelty -- and unlawful possession of a firearm.  On February 23, 1999, the state court sentenced him to life imprisonment and added a concurrent sentence of four to five years on the firearm charge.  Jordan exhausted his state remedies and, on March 26, 2003, the Massachusetts Supreme Judicial Court affirmed his convictions.  See Commonwealth v. Jordan, 439 Mass. 47, 785 N.E.2d 368 (2003).

Jordan petitioned this Court for a writ of habeas corpus on May 5, 2004.  In his petition, Jordan made two claims: (1) the trial court erred in denying his motion to suppress his incriminating statements because they were either immunized or involuntarily made; and (2) the trial court erred in unfairly restricting his cross-examination of Boston police officers and in excluding evidence on the motive and bias of the officers involved in the case, both of which violated his right to confront the witnesses against him.  Each claim was raised and rejected in Jordan's appeal to the SJC.

A.    **Relevant Facts**

The SJC's recitation of the facts is entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1).  See Coombs v. Maine, 202 F.3d 14, 18 (1st Cir. 2000); Avellar v.

DuBois, 30 F. Supp. 2d 76, 79 (D. Mass. 1998).  This deference extends to inferences properly drawn by the state court from its factual determinations.  See Parke v. Raley, 506 U.S. 20, 35 (1992); Flores v. Marshall, 53 F. Supp. 2d 509, 514 (D. Mass. 1999).  That presumption includes findings about the defendant's credibility.  Marshall v. Lonberger, 459 U.S. 422, 431-32 (1983).

The burden is on the petitioner to rebut the presumption of correctness.  28 U.S.C. § 2254(e)(1); Park, 506 U.S. at 35. Because this Court is bound by the SJC's factual findings and resulting inferences, absent a showing of clear and convincing evidence,[2] it is useful to start with the facts as they appear in the SJC's decision denying Jordan's claims.

A recitation of the SJC's relevant findings of fact and law appear below.  I have annotated the SJC's findings based on my own review of the transcript from the suppression hearing in which Jordan challenged the admissibility of his January 9, 1997, statement.  To be sure, there is a considerable disconnect between what the testimony from the suppression hearing reflects and the way that testimony was interpreted by both the motion judge and the SJC.  But because there are two plausible interpretations of the crucial facts surrounding the January 9 interview, as a federal court sitting in habeas review, I am

_____

[2] Petitioner does not contest any of the SJC's factual findings, but he refutes the inferences that the state court drew from those facts.

-4-

bound to affirm the version adopted by the state court.  <u>See</u>

<u>Marshall</u>, 459 U.S. at 432 (to disturb findings of fact, the

federal court "must conclude that the state court's findings

lacked even fair support in the record").  Nevertheless, I

supplement the SJC's findings because I am also bound by my duty

to pursue my own independent fact-finding in the administration

of justice:

> In the early evening hours of February 21,
> 1994, Joseph Dozier was shot and killed on
> the steps in front of Boston Latin Academy in
> the Roxbury section of Boston.  His body was
> riddled with bullets fired from two handguns.
> More than three years later, Kenyatti Jordan
> was indicted for the killing. . . .
>
> Before trial, Jordan moved to suppress
> statements he made to Boston detectives
> during their investigation on January 9,
> 1997, at the office of the United States
> Attorney; on April 16, 1997, at the Bristol
> County House of Correction; and on May 7,
> 1997, at the same location, immediately after
> his indictment for Dozier's murder.  The
> gravamen of Jordan's complaint is that the
> statement he made on January 9 was induced by
> a promise made by Federal law enforcement
> agents (in the presence of the detectives)
> that it would not be used against him in the
> murder investigation.  If that promise was
> not effective, he contends that the
> inducement was the product of police
> deception and his resulting statement was
> involuntary.  He further claims that his
> subsequent statements to the detectives on
> April 16 and May 7 were either covered by the
> initial promise of immunity or irremediably
> tainted by the deception that prompted his
> statement on January 9.
>
> In the three statements at issue, Jordan
> denied being involved in the shooting but

admitted being present at the shooting, being
armed, and being in the company of the person
who he claims actually shot Dozier.  These
statements were pivotal in the homicide
investigation and prosecution because,
although there had been an eyewitness who had
observed two men confront and shoot Dozier,
she could not identify the individuals.
Consequently, Jordan's admissions, combined
with the testimony of the eyewitness that
*both* individuals shot the victim, and
ballistic evidence that guns of two different
calibers were used, formed the core of the
Commonwealth's case against him.[3]

The motion prompted a pretrial suppression
hearing, at which a number of detectives and
Federal law enforcement officers testified.
The motion judge made extensive findings of
fact regarding the circumstances in which
Jordan's statements were made, ultimately
concluding that the Commonwealth had
sustained its burden of proving beyond a
reasonable doubt that they were voluntary and
admissible.  In reviewing the judge's ruling
on voluntariness, we "accept [] the judge's
subsidiary findings of fact absent clear
error, [and] give[] substantial deference to
the judge's ultimate findings and conclusions
of law.'  Commonwealth v. Vao Sok, 435 Mass.
743, 751, 761 N.E.2d 923 (2002), quoting
Commonwealth v. Mello, 420 Mass. 375, 381
n.8, 649 N.E.2d 1106 (1995).

As backdrop to the statements challenged by
Jordan, the judge found that Jordan began
working as an informant for various Federal

---

[3] In a footnote, the SJC explained:

> The only other evidence at trial connecting Jordan to
> the crime came from an individual who resided in the
> same halfway house in which Jordan was living on the
> day of the shooting.  He testified that Jordan
> returned to the house late that evening, watched the
> news, and when the shooting was reported, stated that
> 'me and my boys did this.'

Commonwealth v. Jordan, 439 Mass. 47, 49 n.1, 785 N.E.2d 368 (2003).

and State law enforcement agencies in 1996, making undercover drug purchases in a major drug distribution investigation. When the State police learned that Jordan was a suspect in the 1994 Dozier homicide, they informed the Federal agents involved in the drug investigation, and ultimately accompanied Jordan to a meeting with Detective Herbert Spellman of the Boston police department on December 10, 1996. Spellman noted that Jordan had been interviewed about the murder in 1994, and had told police that he had no involvement in it and had been in the company of a friend, Antonio Jones, and a couple of girls the evening it occurred. Jones had been a prime suspect in 1994 after police found ammunition in his apartment matching the spent ammunition found at the scene of Dozier's murder. . . . The interview concluded.

Jordan was [] on probation in December 1996, as the result of other unrelated [state] crimes, and his probation officer was pressing to have his probation revoked because of new arrests. Federal agents had been rebuffed in their efforts to persuade the probation officer to postpone Jordan's revocation proceeding, scheduled for January 3, 1997, so that Jordan could continue working in their drug investigation. As a consequence, sometime after the December 10 meeting between Detective Spellman and Jordan, one of the Federal agents contacted Boston detectives offering Jordan's further help in the Dozier murder investigation in exchange for their intervention on Jordan's behalf in the probation proceedings. This offer led to the fateful meeting in the United States Attorney's office in Boston on January 9, 1997, attended by Federal agents, an assistant United States attorney, the detectives (including Detective Spellman), and Jordan.

Commonwealth v. Jordan, 439 Mass. at 50-51.

Agent Mitchell testified that he had a conversation with Jordan several days prior to the January 9 interview during which Jordan told him that he would cooperate with state detectives, "but [he wanted] protection." Suppression Hr'g, January 14, 1998, at 88. Agent Mitchell responded that "there's tools in place within the system to protect him, and what is called the first stage is a proffer letter." Id.

The January 9 meeting and interview took place in the United States Attorney's Office at the federal courthouse. Present at the pre-interview meeting in Assistant United States Attorney George Vien's office were Jordan, Vien, federal agents Mitchell and Colameta, and Detective Spellman and Sergeant Joyce of the Boston Police Department. Suppression Hr'g, January 12, 1998, at 30.

> The motion judge found that the participants in the meeting approached it from significantly different perspectives. The detectives thought Jordan was involved in the murder and were under the impression that he was prepared to implicate himself. The Federal agents viewed the meeting as an opportunity for Jordan to provide helpful information about the murder so that the detectives would intercede with Jordan's probation officer. The assistant United States attorney began the meeting by typing up a Federal 'proffer immunity' letter and explaining that if Jordan told the truth nothing he said could be used against him directly but that the police could follow up on the information. The detectives said nothing in response to the statements of the United States attorney, knew that they had no authority to enter into such an agreement, did not sign the letter, and believed that

> the proffer letter had no application to
> proceedings in State court.

Commonwealth v. Jordan, 439 Mass. at 51.

Both of the federal agents testified that Agent Mitchell took the signed federal proffer letter across the hall to make copies and then returned to AUSA Vien's office and distributed them to everyone in the room, including Jordan.  Suppression Hr'g, January 14, 1998, at 93, 134.  Neither of the state detectives recalled this happening.  Agent Colameta recalled Detective Spellman responding "we have no problems" or "we have no concerns" after looking over the freshly-drafted proffer letter in AUSA Vien's office.  Id. at 136.  Neither of the state officers recalled this statement.  Detective Spellman testified that he had never seen a proffer letter before, as they are not used in state investigations.  Suppression Hr'g, January 13, 1998, at 63.  Detective Spellman also testified that he thought that the proffer letter was drafted because the federal agents thought that they would be present during the interview and did not want Jordan to think that they would prosecute him federally for anything he said, id. at 68, although this testimony conflicts with Detective Spellman's testimony that federal agents are not generally permitted in an interview room while state detectives are conducting an investigative interview.  Id. at 65.

All three of the federal agents – Vein, Mitchell, and Colameta – recall AUSA Vein discussing the "ground rules" for the

interview, during which he laid out the terms of the proffer agreement, one of which was that nothing that Jordan said during the interview about the Dozier murder could be used against him directly, as long as we was telling the truth.  Suppression Hr'g, January 14, 1998, at 19, 92, 99, 135.  All three agents testified that the state officers remained silent throughout this explanation.  Id.  Again, neither of the state officers recalled Vein making this presentation.  Jordan was present in AUSA Vein's office throughout this pre-interview meeting.

> The meeting ended and the detectives
> proceeded to enter a separate room to
> interview Jordan.  The Federal agents were
> told that, as a matter of police policy, they
> could not participate in the interview but
> that Jordan could come out to speak to them
> whenever he wished.

Commonwealth v. Jordan, 439 Mass. at 51.

Agent Mitchell testified that he had a brief conversation with Jordan before entering the interview room in which he told him "hey don't hold anything back," and that nothing he said could be used against him.  Suppression Hr'g, January 14, 1998, at 93.  No other officer or agent was privy to or overheard this conversation.

> The interview began by Detective Spellman's
> explaining that he wanted to speak to Jordan
> about the killing of Dozier.  Spellman
> informed Jordan that he was a suspect and
> that he could not offer him any inducements
> or make any promises, but that he would take
> anything that Jordan told them to the Suffolk

> County district attorney.  Spellman then took
> out a card containing the Miranda warnings
> and went through them one at a time.  Jordan
> stated that he understood each of the rights
> explained to him.  Spellman then asked Jordan
> if he wanted to talk, and Jordan responded
> that he wanted to leave the room and talk to
> one of the Federal agents first, which he
> did.  Jordan told the agent that Spellman
> said he had 'no immunity.'

Commonwealth v. Jordan, 439 Mass. at 51.

Sergeant Joyce testified that Jordan "became visibly
nervous" when they told him that "anything he said could be used
against him [and] that we couldn't offer him immunity, promises,
inducements, or rewards for his statements."  Suppression Hr'g,
January 13, 1998, at 82.

> [Then] [A]gent [Mitchell] entered the room to
> talk to Spellman, who told him that only the
> district attorney could grant immunity.

Commonwealth v. Jordan, 439 Mass. at 51.

Agent Mitchell testified that Detective Spellman told him
"you know we can't give him immunity. . . we're talking a
proffer, not. . . an immunization letter. . . you know you can
trust me.'  Suppression Hr'g, January 14, 1998, at 94-95.  No
other testimony corroborated that portion of their conversation.

> [Agent Mitchell] left, conferred with Jordan,
> and told him to 'tell the truth.'  Jordan
> returned to the room and agreed to be
> interviewed.  He did not, however, tell the
> truth.  Instead, the judge found that Jordan
> told a story that he thought would not be
> self-incriminating.  In essence, he told the
> detectives that he had been with Jones the

night of the murder; that Jones had received
a telephone call to meet someone and asked
Jordan to come along; that he did not know
what the meeting was to be about; and that he
remained far away when Jones met Dozier in
front of Boston Latin Academy.  Jordan did
admit, however, that he saw Jones shoot
Dozier and that he and Jones had then fled
the scene together.  Jordan further told the
detectives that Jones went to the meeting
armed with two handguns, and that although
he, Jordan, also was armed, he did not fire
his gun.  The interview then ended.

With regard to this critical meeting between
Jordan and the detectives, the judge
concluded that whatever impression Jordan may
have had about the effect of the 'proffer
immunity' letter when he initially entered
the interview room with the detectives,
before he agreed to be interviewed he knew
that 'it did not provide protection from the
use of anything he might say against him in
state court.'  The judge also found that the
interview was noncustodial, that Jordan was
informed of and fully understood his Miranda
rights, that the interrogation was not
coercive, that Jordan was alert and lucid and
had had extensive experience in the criminal
justice system, and that he acted in a
calculated way, hoping to provide enough
information to avoid a probation revocation
(and incarceration) without incriminating
himself in the crime.  The judge ultimately
concluded that Jordan's statement to the
detectives on January 9 was a 'product of his
free will and rational intellect and was
voluntary.'

Commonwealth v. Jordan, 439 Mass. at 51-52.

Jordan made further incriminating statements to other

detectives in interviews occurring on April 16 and May 7, 1997,

interviews arranged independent of the federal authorities. Each

statement was more incriminating than the last.  As the SJC
found:

> In [the April 16] interview, arranged without
> federal assistance, and tape recorded in
> part, Jordan confirmed that he was aware on
> January 9 that what he was telling the
> detectives was not protected from use in
> State court proceedings, and that he had
> spoken to them because he was tired of being
> suspected of something he did not do.

Commonwealth v. Jordan, 439 Mass. at 53.

**B.    The AEDPA Framework for Habeas Review**

Because Jordan's petition was filed after the effective date
of the Antiterrorism and Effective Death Penalty Act (AEDPA), 28
U.S.C. § 2254, this Court's review is governed by the strictures
of that Act.  Lindh v. Murphy, 521 U.S. 320, 336 (1997).  In
relevant part, AEDPA precludes a federal court from granting
habeas relief unless the state court adjudication (1) "resulted
in a decision that was contrary to, or involved an unreasonable
application of, clearly established Federal law, as determined by
the Supreme Court of the United States," or (2) turned on "an
unreasonable determination of the facts in light of the evidence
presented in the state court proceeding."  28 U.S.C. §
2254(d)(1)-(2); see also Tyler v. Cain, 533 U.S. 656, 660 (2001).
AEDPA also requires that a federal court defer to state court
determinations of factual issues unless the petitioner rebuts the
"presumption of correctness by clear and convincing evidence."

28 U.S.C. § 2254(e)(1); <u>see</u> <u>also</u> <u>Coombs v. Maine</u>, 202 F.3d 14, 18 (1st Cir. 2000).

### 1.    **"Contrary To" Prong**

A state court decision is "contrary to" clearly established Supreme Court precedent in only two circumstances: (a) where "the state court applies a rule that contradicts the governing law set forth in" Supreme Court cases, <u>Williams v. Taylor</u>, 529 U.S. 362, 405 (2000), or (b) where "the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent." <u>Id.</u> at 405-06.  Under either scenario, the state court decision must be "substantially different," "diametrically different," "opposite in character or nature," or "mutually opposed" to clearly established Supreme Court law.  <u>Id.</u>

### 2.    **"Unreasonable Application of" Prong**

A state court decision involves an "unreasonable application" of Supreme Court precedent "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular prisoner's case." <u>Williams</u>, 529 U.S. at 407-09, 413. Merely reaching an incorrect result is not sufficient – the result must also be unreasonable.  Or, as I have said in other

settings, it is not enough for the state court to be wrong.  It has to be really, really wrong.  See L'Abbe v. DiPaolo, 311 F.3d 93, 96 (1st Cir. 2002) (citing Williams, 529 U.S. at 411); see also McCambridge v. Hall, 303 F.3d 24, 36-37 (1st Cir. 2002) (en banc) ("'some increment of incorrectness beyond error is required'. . . The increment need not necessarily be great, but it must be great enough to make the decision unreasonable in the independent and objective judgment of the federal court") (quoting Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000)).

It is well settled that the state court's determination of either the law or the facts must be *objectively* unreasonable for the "unreasonable" prong to be met.  Williams, 529 U.S. at 411. "[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application [or determination] must also be unreasonable."  Id. at 411.

In light of the AEDPA framework, the appropriate question to ask in the instant case is whether the SJC's determination that Jordan's incriminating statements were made voluntarily and knowingly, and that he did not have a constitutional right to garner further trial testimony from Detective Spellman or Agent Mitchell, were decisions running contrary to or unreasonably applying clearly established Supreme Court precedent.  It is not

whether I agree with those findings on this record; it is only whether they "unreasonably appl[ied] clearly established precedent."

## II.  **LEGAL ANALYSIS**

### A.  **Jordan's Fifth Amendment Right Against Self-Incrimination: The Voluntariness of the January 9 Statements to State Detectives**

Jordan argues that the state courts "fundamentally misconceived the import of Jordan's proffer letter from the United States Attorney's Office." See Pet'r Mem. In Supp. of Pet. For Writ of Habeas Corpus at 19.  Specifically, he argues that the motion judge erroneously found that Detective Spellman's announcement to Jordan during the January 9, 1997, interview -- that he did not have the authority to make any promises or offer immunity -- unambiguously narrowed the scope of the proffer letter.  In short, Jordan argues that either the proffer letter extended to his statements to state detectives that day, or that he was deceived into believing that his proffer letter was absolute, thereby rendering his incriminating statements involuntary under the Fifth Amendment.

#### 1.  **The Reach of Jordan's Proffer Letter**

The January 9, 1997, proffer letter is printed on United States Department of Justice, United States Attorney letterhead, with the Boston federal courthouse address appearing at the top. It is signed by Donald Stern, the United States Attorney at the

time, and AUSA Vien.  Jordan is also a signatory.  The letter is
four paragraphs long.  The first paragraph notes the event
covered by the proffer agreement – the murder of Joseph Dozier on
February 21, 1994.  The second and third paragraphs explain the
effect, scope, and limitations of a proffer agreement, including
the interviewee's obligation to tell the truth and the
government's right to make derivative use of any information
provided by the interviewee.  The fourth paragraph states that
the letter does not constitute any sort of plea agreement.
Notably, no state agency, agent, or court is mentioned anywhere
in the letter, nor is any state agent a signatory to the letter.
See Respondent's Supplemental Answer Ex. 4, App. at 27
(hereinafter "Proffer Letter").

The motions judge and the SJC found that "the Federal
'proffer immunity' letter and its terms were not binding on the
Commonwealth."  Commonwealth v. Jordan, 439 Mass. at 53.  In
response, Jordan cites to Murphy v. Waterfront Commission, 378
U.S. 52 (1964).  In that case, the Supreme Court held that a
state witness cannot be compelled to give testimony which may be
incriminating under federal law unless the compelled testimony
and its fruits are barred from use in criminally prosecuting the
witness in federal court.  Id. at 79.  The witnesses in Murphy
faced criminal charges for refusing to testify; in this way,
their testimony was truly compelled.  If Jordan had been

similarly *compelled* to make incriminating statements (e.g. forced
to take the stand despite invoking the Fifth Amendment), then
Murphy would bear on his claim.  But Jordan was not at all
compelled to make his initial incriminating statements on January
9, 1997, nor was he compelled to further incriminate himself
during his two subsequent interviews.  He was Mirandized
(verbally advised that he retained the right to remain silent)
before each of his three interviews with state detectives.  He
was not in custody -- either actually or constructively -- at the
time he made incriminating statements, and he was free to leave
at any time.  Above all, Jordan did not face criminal charges for
invoking his right to remain silent like the witnesses in Murphy.

Jordan has not presented any other case law indicating that
the state courts' finding was an unreasonable application of
well-settled federal case law, nor has he rebutted the state
courts' factual findings with "clear and convincing evidence," as
required under AEDPA.  Indeed, the proffer letter was not signed
by any representative of state law enforcement, and Jordan was
told explicitly that the letter had no bearing on his interviews
with state detectives.  Moreover, state detectives unequivocally
informed Agent Mitchell that the federal proffer agreement did
not cover any statements Jordan may make to them.  See id. at 52;
Suppression Hr'g, January 14, 1998, at 95-95.

-18-

This Court is bound, under AEDPA and general principles of comity, to defer to state court interpretations of state law, unless they are grounded in unreasonable factual determinations. See 28 U.S.C. sec 2254(d)(2). The legal question of whether the proffer letter immunized Jordan from state prosecution is not a question for a federal court to settle, particularly where the SJC -- Massachusetts's highest court has already decided it.

Accordingly, because I find no unreasonable defects in the state court's findings of fact relating to the state-level consequence of the proffer letter, Jordan's only basis for challenging the admissibility of his January 9 statement on federal habeas review is to establish that his words were garnered deceptively in violation of the Fifth Amendment. Notably, even if the proffer agreement did cover Jordan's statements on January 9, Jordan violated one of the explicit terms of the agreement by lying about his involvement in the shooting, or at least changing his story on two subsequent occasions, thereby releasing the government from its end of the contract embodied in the agreement. See Proffer Letter.

### 2. **Did Jordan Waive His Fifth Amendment Rights?**

Regarding the voluntariness of Jordan's incriminating statements, the SJC reiterated and affirmed the motion judge's finding that the January 9 interview was a "product of [Jordan's] free will and rational intellect and was voluntary." Id. at 52.

-19-

The SJC based its conclusion on the totality of the circumstances surrounding Jordan's interview, see <u>United States v. Garcia</u>, 983 F.2d 1160, 1169 (1st Cir. 1993), namely that the interview was neither custodial nor coercive in nature, that Jordan was informed of his Miranda rights at the outset of the interview, that he was alert and lucid, that he had extensive experience in the criminal justice system and in interrogation settings, and, most significantly, that Jordan acted in a calculated way – telling investigators just enough information to avoid a probation revocation without incriminating himself in the crime. <u>Commonwealth v. Jordan</u>, 439 Mass. at 52.  The motion judge was particularly persuaded by a state police officer that during an unrelated arrest, Jordan told explicitly told the officer that he understood his Miranda rights and that he did not have to answer any questions.  Jordan also responded, "Fuck you. . . get a warrant," when the officer tried to search his hotel room. Suppression Hr'g, January 13, 1998, at 124, 126.

To be sure, the SJC's finding of voluntary waiver does not blatantly contravene the relevant Supreme Court precedent. "[W]aiver can be clearly inferred from the actions and words of the person interrogated," <u>North Carolina v. Butler</u>, 441 U.S. 369, 373 (1979), and "the particular facts and circumstances surrounding that case, including the background, experience, and

conduct of the accused" should factor into the question of waiver.  <u>Johnson v. Zerbst</u>, 304 U.S. 458, 464 (1938).

Before beginning the interview, the state detectives read Jordan his Miranda rights and he responded that he understood each of the rights that were read to him.  <u>Commonwealth v. Jordan</u>, 439 Mass. at 52.  Detective Spellman, one of the interviewers, specifically informed Jordan that he was a suspect, that he could not offer him any deals or promises, and that he would communicate anything that Jordan told them to the Suffolk County district attorney.  <u>Id.</u>  Indeed, when Jordan left the interview room to confer with Agent Mitchell, Jordan specifically told Agent Mitchell that the state officers were telling him that he did not have immunity.  Suppression Hr'g, January 14, 1998, at 137.  All of these circumstances buttress the state court's finding that Jordan was aware that his statements were not immune, and that he voluntarily proceeded with the interview anyway.

Indeed, Jordan said as much during an April 16, 1997, interview with other state detectives, where he confirmed that he was aware on January 9 that what he was telling detectives was not protected from use in state court proceedings.

There is, however, another, entirely plausible set of inferences which may be drawn from the events. The implications of the proffer letter were anything but clear, and debriefing a

defendant as to his rights and the consequences of waiving them is not a game of "gotcha."  In such high-stakes settings, the burden is on the government to make its intentions clear, particularly to an uncounseled defendant like Jordan.[4]  <u>See</u> <u>Butler</u>, 441 U.S. at 373.  Because there were many government agents from different offices involved in the events of January 9, and because their messages -- both implicit and explicit -- were confusing and contradictory, Jordan's statements can be read to have been involuntarily given, and his actions can be read to imply *non*waiver of his Fifth Amendment rights.

At the start of the January 9 interview, Jordan was confused about the breadth of his federal proffer letter.  This confusion led him to leave the interview room and inquire with Agent Mitchell standing outside as to why "the [state] detectives were saying he had no immunity."  <u>Commonwealth v. Jordan</u>, 439 Mass. at 55.  When Agent Mitchell went into the interview room without Jordan to inquire about immunity, the state detectives unequivocally informed him that Jordan's federal letter did not protect him from state prosecution.  <u>Id.</u>  Rather than clarify those crucial terms for Jordan, Agent Mitchell merely told Jordan to go back into the room and "tell the truth."  <u>Id.</u>  As it turns out, the federal agents had an incentive to withhold from Jordan

_____

[4] Indeed, AUSA Vien testified that the majority of proffer agreements are consummated in the presence of the interviewee and their counsel; very few are done without counsel present.  Suppression Hr'g, January 14, 1998, at 39-40.

the limitations of his proffer agreement: if Jordan cooperated
with state detectives, they would help defeat his parole
revocation, and Jordan would be able to continue cooperating with
federal agents in their long-term narcotics investigation.

Precisely because there are two plausible stories here, the
one adopted by the motion judge and the SJC -- that Jordan was a
sophisticated, seasoned player in the criminal justice system,
and that the government said just enough to overcome the legal
presumption of nonwaiver, Butler, 441 U.S. at 373, and the one
raising the inference of deception -I am bound to reject this
petition.  State courts are "charged with the primary
responsibility of protecting basic and essential rights, [thus]
we accord an appropriate and substantial effect to their
resolutions of conflicts in evidence as to the occurrence or
nonoccurrence of factual events and happenings. . . because the
trial judge [is] the closest to the trial scene and thus afforded
the best opportunity to evaluate contradictory testimony."
Haynes v. Washington, 373 U.S. 503, 516 (1963).  I cannot, under
the AEDPA regime, overturn the state courts' decision to adopt
and affirm this alternative version of the facts from which one
can reasonably conclude that Jordan's waiver was made knowingly
and voluntarily.

### 3.    The Effect of Harmless Error

Any ambiguity in the voluntariness of Jordan's January 9 statement is a nonissue in light of Jordan's subsequent incriminating statements to state detectives on April 16 and May 7, 1997. The SJC found that "[e]ach of those statements was proceeded by Miranda warnings, properly given, fully understood, and waived." Commonwealth v. Jordan, 439 Mass. at 54. And that "[e]ach statement was progressively more inculpatory." Id. In his final statement on May 7, Jordan admitted to standing next to the suspected shooter when the shooting occurred, although he still denied that he shot the victim. Id. What Jordan did not know at the time was that an eyewitness saw two shooters, so putting himself at the scene was itself inculpatory.

Jordan does not challenge the admissibility of these subsequent statements since they clearly qualify as "cat out of the bag" statements such that the character of the earlier admission will not "determine[] the character of the later, warned confession[s]." Missouri v. Seibert, 542 U.S. 600, 615 (2004)(citing Oregon v. Elstad, 470 U.S. 298, 311-14 (1985)). And because these two statements were surely as probative, if not more probative, of Jordan's guilt than his first statement on January 9, the trial court's admission of the January 9 statement likely amounted to harmless error, even if it also amounted to a constitutional violation. In light of Supreme Court precedent in this area, this Court is precluded from granting habeas relief to

Jordan – a state prisoner – on even a meritorious Fifth Amendment claim unless the Court also finds "that the error, in the whole context of the particular case, had a substantial and injurious effect or influence on the jury's verdict."  <u>Calderon v. Coleman</u>, 525 U.S. 141, 147 (1998).

### B.   <u>Jordan's Rights of Confrontation and Cross-Examination: The Trial Testimony of Detective Spellman And Agent Mitchell</u>

Jordan also alleges that his Sixth Amendment rights to confrontation and cross-examination were violated when the trial judge excluded certain testimony from Detective Spellman, the ranking state detective during the January 9 interview, and Agent Mitchell, the federal agent who accompanied Jordan to the interview.

### 1.   <u>Cross-Examination of Detective Spellman</u>

The SJC found the following facts as to Jordan's claims regarding the cross-examination of Detective Spellman:

> At trial, Detective Spellman was cross-examined extensively regarding his conduct at the January 9 meeting in the United States Attorney's Office and in the interview of Jordan that took place immediately thereafter.  This cross-examination included a line of inquiry directed at exposing Spellman's attitude toward the Federal agents and his reasons for keeping them out of the interview room during his interview of Jordan.  Spellman testified that he kept his opinion about the ineffectiveness of the 'proffer letter' with respect to the State court proceedings to himself at the meeting; that he made no comments to the assistant United States attorney about it; that,

> although he had neglected to bring a Miranda
> waiver form to the meeting, he chose not to
> ask the Federal agents to supply him one;[5]
> and that the 'policy' that he cited in asking
> the Federal agents not to be present during
> the interview was not an official, written
> policy of the Boston police department.
> Spellman also testified that he was not
> concerned that Jordan would 'clam up' if the
> Federal agents were present during the
> interview, but did not want Jordan to feel
> like he was being 'gang[ed] up' by the
> presence of more than two investigators.
>
> Defense counsel then asked Spellman, 'Was it
> your concern that in the privacy of this
> meeting when you started to discuss Miranda
> issues that [the Federal agents] might object
> to Jordan's testimony?'  The prosecutor
> objected and the judge sustained the
> objection.  Jordan claims that the judge's
> action in sustaining the objection violated
> his constitutional right to confront and
> cross-examine witnesses against him.

Commonwealth v. Jordan, 439 Mass. at 54-55.

The essence of Jordan's claim is that he was restricted from
pursuing on cross-examination Detective Spellman's motives for
getting him to talk on January 9.  To the contrary, at trial,
Jordan cross-examined Detective Spellman at length regarding his
attitude toward the federal agents and his motives for barring
them from the interview room.  Respondent's Supplemental Answer
Ex. 5 at 30 (Tr. 5:134-41).  Jordan even had an opportunity to
ask Spellman whether he had feared that Jordan would "clam up" if

---

[5] The SJC noted that "Spellman also testified, however, that just before
he entered the interview room he told the assistant United States attorney
that he intended to advise Jordan of his Miranda rights."  Commonwealth v.
Jordan, 439 Mass. at 54 n.5.

the federal agents were present. Id. (Tr. 5:141). Because
Jordan did have an opportunity for extensive cross-examination,
the SJC found that the trial judge did not abuse his discretion
because "[a]s long as the judge does not completely bar inquiry
into a relevant subject he has broad discretion to limit the
scope and extent of the inquiry." Id. In reaching this
conclusion, the SJC cited both state and federal law holding that
"it has long been recognized that a defendant's right to cross-
examine a witness is not absolute." Id.

Indeed, the Court has consistently reiterated that the
Confrontation Clause of the Sixth Amendment does not prevent a
trial judge from imposing any limits on cross-examination. See,
e.g., Delaware v. Fensterer, 474 U.S. 15, 20 (1985) (per curiam)
("the Confrontation Clause guarantees an *opportunity* for
effective cross-examination, not cross-examination that is
effective in whatever way, and to whatever extent, the defense
might wish"); Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986)
("trial judges retain wide latitude insofar as the Confrontation
Clause is concerned to impose reasonable limits on [] cross-
examination based on concerns about. . . interrogation that is
repetitive or only marginally relevant").

### 2.   Stricken Testimony of Agent Mitchell

With respect to Jordan's claims about the direct examination
of Agent Mitchell, the SJC found the following:

> Jordan also complains that he was unfairly
> restricted in his direct examination of one
> of the federal agents who was present outside
> of the interview room on January 9. That
> agent testified [at trial] as to what
> occurred at the meeting in the United States
> Attorney's office and to a conversation he
> had with Jordan when he left the interview
> room and told him that the detectives were
> saying that he had no immunity.  The agent
> testified that he went into the room, without
> Jordan, and was told by detectives that only
> the district attorney could agree to
> immunity.  He then testified that one of the
> detectives (not Spellman) said, 'You know,
> you can trust us on this.'  The prosecutor
> objected and the judge struck the answer.
> Defense counsel voiced no objection to the
> ruling. . . Even if we were to conclude that
> the judge should have permitted this
> testimony to stand, his ruling striking it
> did not create a substantial likelihood of a
> miscarriage of justice.'

Commonwealth v. Jordan, 439 Mass. at 55-56.

Moreover, the stricken testimony did not speak to the voluntariness of Jordan's statement; the stricken statement – "You know, you can trust us on this" – was not made in Jordan's presence nor was it conveyed to him.  Jordan, 439 Mass. at 55-56. And the jury heard testimony from several other witnesses from whom they could fairly determine the voluntariness of Jordan's January 9 statement.  In this way, the SJC determined that the stricken statement was not so highly probative that the fairness of the proceeding was disrupted by its exclusion.

Thus, this case is not one in which the trial judge excluded highly probative evidence, or prevented the defense from pursuing

an entire theory, such that the trial judge abused its discretion by "significantly undermining fundamental elements of the defendant's defense." United States v. Sheffer, 523 U.S. 303, 315 (1998). In light of the AEDPA, it cannot be said that the SJC's decision that the trial judge did not abuse its discretion amounted to an unreasonable application of federal law regarding Jordan's Sixth Amendment rights to confrontation and cross-examination.

**III. CONCLUSION**

For the reasons discussed above, Jordan's petition for a writ of habeas corpus is **DENIED**.


**SO ORDERED.**

**Dated: December 22, 2005          s/ NANCY GERTNER U.S.D.J.**